ELIZABETH HOPKINS, SBN: 324431
KANTOR & KANTOR
19839 Nordhoff Street
Northridge, California 91324
Telephone: (818) 886-2525
Facsimile: (818) 350-6274
Email: ehopkins@kantorlaw.net

W. DANIEL MILES, III (*pro hac vice* pending)
JAMES EUBANK (*pro hac vice* pending)
BEASLEY ALLEN CROW METHVIN
   PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (800) 898-2034
Facsimile: (334) 965-7555
Email: dee.miles@beasleyallen.com
      james.eubank@beasleyallen.com

THOMAS O. SINCLAIR (*pro hac vice* pending)
REBECCA D. GILLILAND (*pro hac vice* pending)
SINCLAIR LAW FIRM, LLC
2000 SouthBridge Parkway, Suite 601
Birmingham, Alabama 35209
Telephone: (877) 249-0091
Facsimile: (205) 868-0894
Email: tsinclair@sinclairlawfirm.com
      rgilliland@sinclairlawfirm.com

EDWARD S. STONE (*pro hac vice* pending)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, Connecticut 06830
Telephone: (203) 930-3401
Facsimile: (203) 348-8477
Email: eddie@edwardstonelaw.com

**ATTORNEYS FOR PLAINTIFFS AND
THE PROPOSED CLASS**

1

**UNITED STATES DISTRICT COURT**

2

**NORTHERN DISTRICT OF CALIFORNIA**

3

4
KRISHNAN R. THONDUKOLAM, STEPHEN
W. RECORDS, WILLIAM C. MALLONEE and

5
DAVID L. EVERETT, individually and as
representatives on behalf of a class of similarly

6
situated persons,

7
                          Plaintiffs,

8
        vs.

9
CORTEVA, INC., DOW INC., DOWDUPONT

10
INC., DUPONT DE NEMOURS, INC., E.I. DU
PONT DE NEMOURS AND COMPANY,

11
THE DOW CHEMICAL COMPANY, U.S.
DUPONT PENSION AND RETIREMENT

12
PLAN, THE ADMINISTRATIVE
COMMITTEE, BENEFIT PLAN

13
ADMINISTRATION COMMITTEE,
DOWDUPONT, INC., BOARD OF

14
DIRECTORS, LAMBERTO ANDREOTTI,
AJAY BANGA, JACQUELINE K. BARTON,

15
JAMES A. BELL, EDWARD D. BREEN,
ROBERT A. BROWN, ALEXANDER M.

16
CUTLER, RICHARD K. DAVIS, JEFF M.
FETTIG, MARILYN A. HEWSON, LOIS D.

17
JULIBER, PAUL POLMAN, JAMES M.
RINGLER, RUTH G. SHAW, LEE M.

18
THOMAS, HOWARD UNGERLEIDER,
PATRICK J. WARD, E.I. DU PONT DE

19
NEMOURS AND COMPANY BOARD OF
DIRECTORS, ELEUTHERE I. DU PONT,

20
JAMES L. GALLOGLY, ULF MARK
SCHNEIDER, THE DOW CHEMICAL

21
COMPANY BOARD OF DIRECTORS,
ANDREW N. LIVERIS, RONALD C.

22
EDMONDS, MARK LOUGHRIDGE,
RAYMOND J. MILCHOVIC, ROBERT S.

23
MILLER, DENNIS H. REILLEY, JENNIFER
SLOAN, BENITO CACHINERO-SÁNCHEZ,

24
JOHANNA SÖDERSTRÖM and NICHOLAS
FANANDAKIS,

25
                          Defendants.

26

Case No.:

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF ERISA**

27

28

Plaintiffs, Krishnan R. Thondukolam, Stephen W. Records, William C. Mallonee and David L. Everett ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following:

## I.   PRELIMINARY STATEMENT

1.     Plaintiffs, participants in the U.S. DuPont Pension and Retirement Plan (the "Plan"), bring this action on their own behalf and on behalf of all similarly situated participants, their beneficiaries and estates, pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). The Fund and its trustees specifically named below (collectively "Defendants") have failed to comply with the requirements of ERISA.

2.     Nearly two years ago, The Dow Chemical Company merged with the 217-year-old E.I. du Pont de Nemours and Company, one of the oldest companies in the United States. The combined entity, DowDuPont, was the largest chemical conglomerate in the world. The two historical companies had intended and planned from the beginning to separate into three wholly independent companies and move the Plan to one of the newly formed companies.

3.     Barely a year later more details on the plan were finally released when, on November 1, 2018, Ed Breen, CEO of DowDuPont, announced that the Plan, along with Historical DuPont,  were moving to a company with the trade name Corteva Agriscience (legally named Corteva, Inc. ("Corteva")), a spin-off purely focused on agriculture. The existence of Historical DuPont, the Plan's sponsor for more than a century and the company for whom the plan participants worked, would be mostly nominal, as all of the assets and business lines of that company other than its agricultural businesses would stay with the New DuPont or the New Dow, while all of its pension liabilities, along with tremendous litigation liabilities, would transfer.

4.     Retirees were told by Breen to take comfort in the fact that Corteva was going to be "highly rated" and that a recent contribution of $1.1 billion had been made to top up the Plan which, at the time, was still short of being fully-funded by several billion dollars. In fact, the

shortfall was more than $3.2 billion at the end of 2018 when using the artificially inflated interest rates amended into ERISA by MAP-21 and more than $5.9 billion at the end of 2018 using unadjusted, traditional ERISA rates as described in greater detail *infra*.

5.       Using artificially high interest rates to calculate statutory segment rates decreases the funding shortfall that a Plan is required to disclose to participants annually. At the same time, these inflated interest rates decrease the minimum amount a plan sponsor is required to be contribute each year. Understated liabilities and reduced contributions are a double whammy. Not only are the Plan's liabilities understated, but, because liabilities are directly linked with funding requirements, less cash is being invested to cover future benefits. Should Corteva suffer any downturns in its business, retirees are at risk. More importantly, Historical DuPont, the steward of the Plan since its formal adoption on September 1, 1904 is no longer a functioning business capable of meeting its funding obligations under the Plan. Instead, it is a wholly-owned subsidiary of Corteva, to whom the Plan participants must now turn for their promised benefits.

6.       In other words, DowDuPont and New Dupont are kicking the Plan down the road along with the retirees that built the historical company. The new companies, by leaving Historical DuPont as the Plan Sponsor and moving that company, after having eviscerated the Plan Sponsor's business operations, to Corteva, have removed themselves from the controlled group of the Plan. The importance of this change is described below, but, in summary, were Corteva to fail and file for bankruptcy, the Plan can be terminated through a distress proceeding without affecting the other companies. If the other companies had not removed the Plan from their controlled group, the Plan could not be terminated through a bankruptcy filing unless all members of the controlled group also filed for bankruptcy.

7.       There are some indemnification agreements amongst the three, but Corteva acknowledges that the uncapped liabilities may well exceed those arrangements. There is no

discernable agreement regarding the Plan assets, funding, or liabilities other than the shift of all pension assets and liabilities, along with the Plan Sponsor, to Corteva's controlled group.

8.     In violation of ERISA and in violation of their fiduciary duties to retirees, Dow, DuPont, Plan Sponsor and certain individual officers and directors have, among other violations, acted disloyally and engaged in prohibited transactions by putting their own financial interests in front of retiree earned benefits. These individuals and entities are motivated by self-interest and have fatal conflicts of interest that prevent them from making appropriate impartial decisions about the future of more than 120,000 retirees and their families.

9.     Plaintiffs, for themselves and on behalf of one or more classes of pension plan participants and their beneficiaries, seeks permanent injunctive relief, declaratory plan-wide relief, make-whole relief for their losses, and/or disgorgement of ill-gotten profits against the defendants on the grounds identified below:

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and under the specific jurisdictional statute for claims brought under ERISA, 29 U.S.C. § 1132(e), (f).

11.     Pursuant to 29 U.S.C. § 1132(e)(2), venue is proper in this District, in that the Defendants may be found in this District and/or because one of the Plaintiffs and other participants in the Plan earned and accrued pension benefits while residents within this district, and pursuant to 28 U.S.C. § 1391(b).

## III.     PARTIES

**A.     Plaintiffs**

12.     Plaintiff Krishnan R. Thondukolam is a participant of the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Contra Costa County, California. At the time

of his retirement, he had nearly 40 years of qualified service within the meaning of the Plan from January 1975 until December 2014.

13.     Plaintiff Stephen W. Records is a participant of the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Pinal County, Arizona. At the time of his retirement, he had nearly 36 years of qualified service within the meaning of the Plan from August 1979 until September 2015.

14.     Plaintiff William C. Mallonee is a participant of the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Lane County, Oregon. At the time of his retirement, he had over 35 years of qualified service within the meaning of the Plan from June 1966 until October 2001.

15.     Plaintiff David L. Everett is a participant of the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Ada County, Idaho. At the time of his retirement, he had over 36 years of qualified service within the meaning of the Plan from June 1979 until December 2015.

**B.     Defendants and Fiduciary Status**

14.     Defendant Corteva, Inc., ("Corteva") is a Delaware corporation with its corporate headquarters located at 974 Centre Road, Wilmington, Delaware 19805. As of June 1, 2019, Corteva, a former subsidiary of DuPont, is now the parent company of Historical DuPont and is the entity with ultimate responsibility for the maintenance of the Plan.

15.     Defendant Dow Inc. ("Dow") is a Delaware corporation with its corporate headquarters located at 2211 H.H. Dow Way, Midland, Michigan 48674. Dow Inc. was formed as a wholly owned subsidiary of DowDuPont and served as a holding company for the materials science business of DowDuPont and became the temporary, direct parent company of Historical Dow.

16.     Defendant DowDuPont, Inc. ("DowDuPont"), is an agricultural, materials science, and specialty products manufacturer that formed as the result of a merger between Defendant Historical DuPont and Defendant Historical Dow. It is incorporated in the State of Delaware with its corporate headquarters located at 974 Centre Road, Wilmington, Delaware 19805.

17.     Defendant DuPont de Nemours, Inc., ("New DuPont") is a Delaware corporation with its corporate headquarters located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.

18.     Defendant E. I. du Pont de Nemours and Company ("Historical DuPont" or "Plan Sponsor") is a Delaware corporation with a corporate headquarters located at 974 Centre Road, Chestnut Run Plaza 730/2355-1, Wilmington, Delaware 19805. Historical DuPont is the technical sponsor of the Plan but is now a subsidiary of Corteva with no separate assets or business operations.

19.     Defendant The Dow Chemical Company ("Historical Dow"), is a Delaware chemical corporation with its corporate headquarters located at 2040 Dow Center, Midland, Michigan 48674.

20.     Defendant U.S. DuPont Pension and Retirement Plan (the "Plan") is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 USC § 1002(2)(A). It is also a "defined benefit pension plan" within the meaning of ERISA §3(35), 29 U.S.C. § 1002(35).

21.     Title I, Section II of the Plan documents names Defendant Administrative Committee as the "Plan Administrator" and "named fiduciary" of the Plan. The Administrative Committee, and its members, are the "Administrator" of the Plan, within the meaning of ERISA § 3(16)(A)(i), 29 USC § 1002(16)(A)(i); "plan fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); and the "named fiduciaries" of the Plan with the authority and control to manage the operation and administration of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). Under the Plan, the Administrator has authority to adopt rules,

1   regulations, and policies for the Plan's administration, to make eligibility and other benefits

2   determinations under the Plan, and to interpret and/or effectuate the Plan. The Administrative

3   Committee and its members in their official capacities and both individually and collectively claim

4   to serve as the Plan's "Administrator" under 29 U.S.C. § 1002(16).

5       22.     The Summary Plan Description, in a section entitled "Administrative Plan Details,"

6   names Defendant Benefit Plan Administrative Committee ("BPAC") as the Plan Administrator.

7   Accordingly, the BPAC and its members, are the "Administrator" of the Plan, within the meaning

8   of ERISA § 3(16)(A)(i), 29 USC § 1002(16)(A)(i); "plan fiduciaries" within the meaning of

9   ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); and the "named fiduciaries" of the Plan with the

10  authority and control to manage the operation and administration of the Plan within the meaning of

11  ERISA § 402(a), 29 U.S.C. § 1102(a).

12

13      23.     The Historical companies, their Boards of Directors, and the individual members of

14  those Boards determined the strategy to combine the two companies and then ultimately divide the

15  company into three wholly independent companies thereby eviscerating the historical business

16  operations that supported the Plan. Due to the nature of the agreements and the companies, there is

17  and has been overlap between the Historical companies' boards, the combined company's board,

18  and the New companies' boards. At different times, and depending on their various board

19  positions, the individuals listed below formulated and/or executed the strategy regarding the Plan

20  assets and liabilities as described herein.

21

22      24.     Furthermore, The Third Amendment to the Plan, signed on December 21, 2016,

23  states that the "Chair and Chief Executive Officer, the Executive Vice President and Chief

24  Financial Officer, the Senior Vice President – Human Resources, or any Vice President, DuPont

25  Finance in such party's sole discretion" shall have the power to designate which business

26  operations of Historical DuPont and Historical Dow "cease to be a part of the controlled group . . .

27  of the company sponsoring [the Plan]." Because of the timeline and change in positions on the

28

boards of the various companies, certain individuals may have served as fiduciaries in more than one position and on more than one board. The naming of the individuals below as a member of one board does not negate or affect their fiduciary status when serving on another board or as a fiduciary with discretionary authority as described in the Plan documents.

25. Defendant DowDuPont, Inc., Board of Directors ("DD Board"), and its individual members had authority or control respecting management or disposition of the Plan assets and meet the definition of "plan fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The individual members of the DD Board at the time of the separation wherein the strategy for removing the Plan assets and liabilities from the controlled group of New DuPont and New Dow was formulated were:

a. Defendant Lamberto Andreotti was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

b. Defendant Ajay Banga was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

c. Defendant Jacqueline K. Barton was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

d. Defendant James A. Bell was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

e. Defendant Edward D. Breen was Chief Executive Officer and a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.  As Chief Executive Officer of

DowDuPont, Defendant Breen had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

f.     Defendant Robert A. Brown was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

g.     Defendant Alexander M. Cutler was Co-Lead Independent Director and a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

h.     Defendant Richard K. Davis was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

i.     Defendant Jeff M. Fettig was Executive Chair, Co-Lead Independent Director, and a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.   As Executive Chair of the DD Board, Defendant Fettig had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

j.     Defendant Marilyn A. Hewson was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

k.     Defendant Lois D. Juliber was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

l.     Defendant Paul Polman was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

m.   Defendant James M. Ringler was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

n.   Defendant Ruth G. Shaw was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

o.   Defendant Lee M. Thomas was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

p.   Defendant Howard Ungerleider was Chief Financial Officer and a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.  As Executive Vice President and Chief Financial Officer of DowDuPont, Defendant Ungerleider had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont. Defendant Ungerleider also served as Vice Chairman and member of the HD Board and Chief Financial Officer Historical Dow.

q.   Defendant Patrick J. Ward was a director on the DD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

26.   Defendant Historical DuPont Board of Directors ("HDP Board") and its individual members had authority or control respecting management or disposition of the Plan assets and meet the definition of "plan fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The individual members of the HDP Board at the time of the merger wherein the strategy for removing the Plan assets and liabilities from the controlled group of New DuPont and New Dow was formulated were:

a.    Defendant Edward D. Breen was the chairman of the HDP Board, Chief Executive Officer, and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.  As Chair and Chief Executive Officer of Historical DuPont, Defendant Breen had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

b.    Defendant Lamberto Andreotti was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

c.    Defendant Robert A. Brown was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

d.    Defendant Alexander M. Cutler was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

e.    Defendant Eleuthere I. du Pont was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

f.    Defendant James L. Gallogly was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

g.    Defendant Marillyn Adams Hewson was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

h.    Defendant Lois D. Juliber was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary control over the

management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

  i. Defendant Ulf Mark Schneider was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

  j. Defendant Lee M. Thomas was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

  k. Defendant Patrick J. Ward was a director on the HDP Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary control over the management or administration of the Plan with respect to the transfer of Plan assets and liabilities.

27. Defendant Historical Dow Board of Directors ("HD Board") had authority or control respecting management or disposition of the Plan assets and meet the definition of "plan fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The individual members of the HD Board at the time of the merger wherein the strategy for removing the Plan assets and liabilities from the controlled group of New DuPont and New Dow was formulated were:

  a. Defendant Andrew N. Liveris was the Chief Executive Officer and Chairman of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Liveris, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan. Defendant Liveris also served as Executive Chairman of the DD Board.  In that role, Defendant Liveris had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

  b. Defendant Ajay Banga was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Banga, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

c.   Defendant Jacqueline K. Barton was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Barton, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

d.   Defendant James A. Bell was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Bell, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

e.   Defendant Richard K. Davis was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Davis, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

f.   Defendant Ronald C. Edmonds was Vice President, Controller, member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Edmonds, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

g.   Defendant Jeff M. Fettig was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Fettig, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

h.   Defendant Mark Loughridge was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Loughridge, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

i.   Defendant Raymond J. Milchovic was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Milchovic, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

j.   Defendant Robert S. Miller was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Miller, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

k.   Defendant Paul Polman was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Polman, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

l.   Defendant Dennis H. Reilley was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Reilley, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

m.   Defendant James M. Ringler was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Ringler, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

n.   Defendant Ruth G. Shaw was a member of the HD Board and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Shaw, in his role as HD Board member and in conjunction with the HDP Board, exercised discretionary control over the management or administration of the Plan.

28.   Defendant Jennifer Sloan, Director, Global Rewards, is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Sloan exercised discretionary control over the management or administration of the Plan. Defendant Sloan, in her role as Plan fiduciary, was the signatory on several Plan amendments discussed herein.

29.   Defendant Benito Cachinero-Sánchez was the Senior Vice President – Human Resources of Historical DuPont and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Cachinero-Sánchez exercised discretionary control over the management or administration of the Plan. Defendant Cachinero-Sánchez, in his role as Plan fiduciary, was the signatory on at least one Plan amendment discussed herein. As Senior Vice President – Human Resources of Historical DuPont, Defendant Cachinero-Sánchez had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

30.     Defendant Johanna Söderström was the Senior Vice President – Human Resources of DowDuPont and is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendant Söderström exercised discretionary control over the management or administration of the Plan.   As Senior Vice President – Human Resources of DowDuPont, Defendant Söderström had authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

31.     Defendant Nicholas Fanandakis was the Executive Vice President and Chief Financial Officer of Historical DuPont and also served as the Vice President, DuPont Finance. Defendant Fanandakis is a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). As Executive Vice President and CFO and as Vice President, DuPont Finance, Defendant Fanandakis had decision-making authority to determine which business operations would cease to be a part of the controlled group of the company that would continue to sponsor the Plan after the separation of DowDuPont.

## IV.     CLASS ACTION ALLEGATIONS

32.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All participants in and beneficiaries of the U.S. DuPont Pension and Retirement Plan or, if deceased, their Estates, who are vested and eligible to either currently receive benefits under the Plan or who are vested and qualified to receive benefits at a future date.

33.     **Numerosity**. The Class is large in number; the exact number and identities of all Class members are currently unknown to Plaintiffs but are known to Defendants. The number of Class members affected by the improper handling of the Plan is believed to be in excess of 100,000. Moreover, the members of the Class are so numerous and so geographically dispersed

across the country that joinder of all Class members is impracticable. According to the Plan's 2014 Form 5500, at the beginning of Plan Year 2014, there were 140,654 participants in the Plan. At the beginning of the 2015 Plan Year, there were 137,371 participants. The 2016 Form 5500 filing for Plan Year 2016 indicates there were a total of 134,046 participants in the Plan at the beginning of that Plan Year. At the beginning of Plan Year 2017, the total number of participants was 121,174.

34.     **Commonality**. There are questions of law or fact common to all members of the Class that concern Defendants' actions and entail consideration of Plan and ERISA provisions uniformly applicable to all Class members. Resolution of these questions will not require individual inquiry into the actions or circumstances of individual Plan participants. These common questions of law or fact center upon whether the Defendants breached their fiduciary duties in violation of ERISA and the Plan in failing to recognize and/or causing the declining financial stability and funding status of the Plan and in failing to contribute or cause the Plan Sponsor to contribute a sufficient amount to keep the Plan viable prior to the Defendants' transfer of all of Historical DuPont's assets into a wholly separate company that was once a subsidiary.

35.     **Typicality**. Plaintiffs are members of the Class as defined above. They have all been similarly harmed by the Defendants' actions in violating the Plan documents and failing to properly fund and otherwise protect the Plan and its participants and beneficiaries and they assert the same claims and legal theories under the same provisions of ERISA and Regulations promulgated thereunder that all Class members possess.

36.     **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the absent members of the Class. Because their claims are typical of those of absent members of the Class, Plaintiffs have every incentive to vigorously pursue those claims on behalf of absent Class members, and their interests coincide with, and are not antagonistic to, those of the Class. Moreover, Plaintiffs are represented by counsel experienced in ERISA and complex class action litigation.

37.     **Rule 23(b)(1) Requirements**. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and a risk of adjudications which as a practical matter would be dispositive of the interests of other members of the Class who are not parties.

38.     **Rule 23(b)(2) Requirements**. Defendants have acted and/or refused to act and are likely to act and/or refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and other relief with respect to the Class as a whole.

**V.     FACTS**

**A.     ERISA's Employee-Protective Purpose**

39.     In early America, prior to the industrial revolution, most people lived and worked on farms or as craftsmen practicing a trade. With the rise of manufacturers, employers wanted to attract workers but incentivize them to eventually retire and make room for incoming, younger workers.

40.     The first private pension plan established in the United States was created by the American Express Company in 1875. Other companies began to follow suit, offering their own defined benefit plans – plans that paid workers a specific monthly benefit when they retired, typically funded entirely by the employers.

41.     With companies competing for a limited supply of workers, pay was one factor in attracting employees, but pension offerings are what convinced the workers to stick around for the long-term instead of changing to a different employer. These early plans, though, typically had very long vesting terms, about 20 years or more.

42.     When ERISA was passed in 1974, the predominant form of pension plan was the defined benefit (DB) plan, which provides, for employees who have worked a sufficient number of years for their pensions to "vest," a set monthly benefit at retirement that is usually either a percentage of salary or is calculated under a formula based on salary and years of service. The

other kind of pension plan, called a defined contribution ("DC") plan, is now the predominate type of plan. A DC plan provides benefits based on the investment returns on contributions made by the employer (and often the employees) to individual participant accounts, and thus does not guarantee the amount of the monthly pension benefit, which is often not as generous as in a DB plan.

43.    DB plans, which are insured by a government agency, the Pension Benefit Guarantee Corporation ("PBGC"), are sponsored and funded by employers, who appoint trustees and other fiduciaries to make investment and plan management decisions. In contrast, DC plans are not insured by the PBGC and the amount participants receive at retirement is not guaranteed, but because DC plans employ individual investment accounts, the participants often have more control over the investment of those assets.

44.    Before ERISA was passed, there was very little protection, if any, for participants in either type of plan. Not only could their pensions be easily mismanaged and then terminated, there were no funding requirements for employers who sponsored DB plans and no insurance program to guarantee promised payments.

45.    The lack of protection for American workers became a national concern in 1963 when Studebaker shut down its plant in South Bend, Indiana and terminated its pension plan. Because of the termination, more than 4,000 autoworkers who had just lost their jobs also lost all or part of their pension plan benefits, a result that highlighted the tenuous position many employees faced. Despite promises of a set pension amount at retirement, any company could close or terminate their pension plans, leaving many more thousands of workers without the retirement income on which they were counting.

46.    Congress responded, after more than a decade of study, by passing ERISA in 1974, a law designed to "protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries . . . [and provide] appropriate remedies, sanctions, and ready access to

the Federal courts." 29 U.S.C. § 1001. ERISA protects not only DB and DC pension plans, but other types of employee benefit plans as well. As the history and name of the law suggests, a primary focus of the law was to protect employees who participated for many years in their company's DB pension plan from the risk that they would receive little or nothing when they retired. Thus, many of the major reforms enacted as part of ERISA – the statute's strict fiduciary standards of conduct, the minimum vesting and funding requirements, the disclosure requirements and a government-run insurance program for terminated DB plans (the PBGC) – are  specifically designed to ensure that workers receive the pension benefits they are promised.

### 1.   Fiduciary Duties Under ERISA

47.     In keeping with the trust law underpinnings of the statute, ERISA requires that every employee benefit plan be established and maintained pursuant to a written plan document that expressly provides for one or more named fiduciary charged with managing and administering the plan. 29 U.S.C. § 1102(a)(1), (2). And, although ERISA requires that any assets of the plan be held in trust by a trustee, the statute broadly defines the term fiduciary, not just "in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, see 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons subject to fiduciary duties – and liable for damages – under [29 U.S.C. § 1109]." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

48.     Thus, in addition to persons designated in plan documents as fiduciaries, by statute, a fiduciary is any person that "exercises *any* discretionary authority or discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets." Persons that render investment advice for a fee or other compensation are also fiduciaries of a plan. Additionally, any person that has "*any* discretionary authority or discretionary responsibility in the administration of such plan" is also a fiduciary.  29 U.S.C. § 1002 (emphasis added).

49.     Fiduciaries of a plan, under ERISA, 29 U.S.C. § 1104, are charged with discharging their duties "with respect to a plan solely in the interest of the participants and beneficiaries" and

    a.     For the exclusive purpose of:

        i.     Providing benefits to participants and their beneficiaries; and

        ii.     Defraying reasonable expenses of administering the plan;

    b.     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    c.     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

    d.     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

50.     These trust-law based fiduciary duties of prudence and loyalty are "the highest known to the law."  29 U.S.C. § 1104.

51.     ERISA is also designed to serve its remedial purposes of protecting plan participants and beneficiaries "by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect" to their plans.  29 U.S.C. § 1001(b). *See also* 29 U.S.C. § 1001(a) (addressing "the lack of employee information and adequate safeguards concerning [plan] operation" by requiring "that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans").

52.     Title I of ERISA, accordingly, begins in Part 1 with certain reporting and disclosure requirements for plans. Specifically, sections 1021-1025 lay out requirements including the provision of a summary plan description ("SPD"), annual reports, and participant's benefit rights, among other things. The duty to disclose information is both encompassed within ERISA's

statutory duties of prudence and loyalty as well as being specifically enumerated by the statute's disclosure requirements.

53.     In addition to their specific statutory disclosure duties, ERISA fiduciaries also have a duty not to mislead participants or to misrepresent the terms or administration of the Plan, as well an affirmative duty to accurately disclose information that could materially impact benefits, regardless of whether or not a participant asks for that information.

54.     It is, therefore, a breach of fiduciary duty to mislead plan participants, regardless of whether the statements or omissions were made negligently or intentionally.

55.     ERISA also contains provisions flatly prohibiting certain transactions between a plan and an interested party, referred to as a "party in interest," 29 U.S.C. § 1106, unless they are proven to be exempted under the statute. 29 U.S.C. § 1108. These prohibited transactions include any transfer of assets from a plan to a party in interest, as well as any self-dealing transactions involving plan assets that are for the benefit of the fiduciary or any other party whose interests are adverse to the plan or its participants and beneficiaries.

56.     A fiduciary that breaches his or her duties to the plan for which it serves as fiduciary is personally liable to make good to the plan any losses resulting from a breach of those duties and to restore to the plan any profits the fiduciary received through the use of assets of the plan by the fiduciary and can be subject to injunctive and other appropriate equitable relief.

57.     Co-fiduciary liability, under certain circumstances, can impose additional liability on fiduciaries of a plan based on the actions of another fiduciary of the plan.

58.     It arises when one fiduciary knowingly participates in or knowingly undertakes to conceal an act or omission of another fiduciary when he or she knows the act or omission is a breach of their duty. It also arises when a fiduciary's breach of duty enables another fiduciary to commit a breach or when a fiduciary has knowledge of a breach by another fiduciary, unless he or she makes reasonable efforts to remedy the breach.

**B.      Plan Funding Requirements Applicable to ERISA DB Plans Under the Internal Revenue Code and ERISA**

59.      Both ERISA and the Internal Revenue Code ("IRC") require plan sponsors to make an annual Minimum Required Contribution ("MRC") to DB pension plans that is designed to ensure the plan has the ability to pay its promised future benefits. 29 U.S.C. § 1083; 26 U.S.C. § 430. To determine the amount to be contributed, plan sponsors are required to calculate the plan's funding target, which is the yearly costs of what it is currently obligated to pay to retirees, plus any additional costs resulting from the unpaid costs that were not paid in previous years.

60.      Plan sponsors may contribute more than the MRC in a plan year. This can be accounted for by increasing, generally, the assets of the plan, or by segregating the overpayment into a "prefunding" or "funding standard carryover" account, which can be applied by a plan sponsor to meet future MRC payments. For this reason, prefunding and funding standard carryover balances are not included when determining whether plan assets meet the plan's funding target.

61.      Where the value of plan assets (less the sum of the plan's prefunding balance and funding standard carryover balance) is less than a plan's funding target, section 430(a)(1) of the IRC defines the MRC as the sum of three numbers: the plan's target normal cost, the shortfall, and the waiver amortization charges for that plan year. 26 U.S.C. § 430(a)(1); *see also* 29 U.S.C. § 430(a)(1).

62.      If, on the other hand, the value of plan assets (less the sum of the plan's prefunding balance and funding standard carryover balance) equals or exceeds the funding target, IRC section 430(a)(2) defines the MRC as the plan's target normal cost for the plan year reduced (but not below zero) by the amount of the excess. 26 U.S.C. § 430(a)(2); *see also* 29 U.S.C. § 430(a)(2).

63.      Section 412 of the IRC provides that in cases of business hardship an employer may seek a waiver of the MRC if the employer is unable to meet the minimum funding standard for a year and applying the MRC standard would "be adverse to the interest of plan participants in the

aggregate." The Secretary of the Treasury may issue a waiver for the plan for no more than three of any fifteen consecutive plan years. 26 U.S.C. § 412.

64.     To determine if a business qualifies as being in a temporary substantial business hardship and qualifies for a waiver, IRC § 412 requires consideration of a number of factors, including whether:

a.     The employer is operating at an economic loss,

b.     There is substantial unemployment or underemployment in the trade or business and in the industry concerned,

c.     The sales and profits of the industry concerned are depressed or declining, and

d.     It is reasonable to expect that the plan will be continued only if the waiver is granted.

65.     Further, before granting any substantial hardship waiver, the Treasury Secretary must provide the PBGC notice of the completed application for a waiver and an opportunity to comment on the application within 30-days of the PBGC's receipt of the notice.

66.     If a single-employer plan is a member of a controlled group, as defined in the IRC, the temporary substantial business hardship requirements may only be met if both the employer and the employer's controlled group (determined by treating all controlled group members as a single entity) satisfy the hardship and notice requirements. 26 U.S.C. § 412.

67.     Defined in 26 U.S.C. § 1563, a controlled group of corporations means any group of parent-subsidiary controlled group, brother-sister controlled group, a combined group, or certain insurance companies, if the group of corporations meet the other requirements, like stock ownership.

68.     To determine plan liabilities, ERISA lays out when a plan sponsor should use which interest rate. The calculation is based on when the plan expects to pay out benefits: within five

years, between five and twenty years, and after twenty years. The interest rate applicable to each of those payout segments is called the segment rate. 29 U.S.C. § 1083(h)(B)(2).

69.     The MRC calculation is thus linked to the plan's liabilities and is adjusted based on fluctuations in interest rates.

70.     Lower interest rates will result in the assets in the Plan growing more slowly, and because future liabilities are set based on the number of pension beneficiaries, their accrued benefits, and their life expectancy, the result may be an underfunded plan that cannot meet its future obligations. To offset the slower growth associated with lower interest rates, the MRC calculation in such a situation would require a higher contribution to help the Plan meet those future benefit payments to plan participants.

71.     Conversely, when interest rates are high, the expected growth of plan assets means that a plan appears more funded when compared to its long-term obligations and the MRC calculation from that comparison results in a lower minimum payment by a plan sponsor for that year.

72.     Strong markets and the resulting high interest rates in the 1990s inflated plan assets for pension plans, which in turn reduced the required MRCs for employers. With the downturn of the market in the 2000s, not only were the value of the plans' assets reduced, but interest rates used to calculate funding requirements also plummeted. Thus, many plans became underfunded or less securely funded essentially overnight.

73.     In response to the economic downturn, the Pension Funding Equity Act of 2004 ("Equity Act") and the Pension Protection Act of 2006 ("PPA") altered the calculations for

funding requirements. The combination of these statutes and the decreased interest rates created what has been referred to as the "perfect storm."[1]

74.     The PPA made changes to the ERISA funding calculations and specified interest rates to be used in determining the present value of a plan's normal cost and funding target. After the PPA, present value is calculated using three segment rates, each of which applies to benefit payments that are expected to be due within certain time periods: less than five years, 5-15 years, and over 15 years.

75.     There are three segment rates used to determine the funding target of a plan. The first segment rate means "the single rate of interest which shall be determined by the Secretary for such month on the basis of the corporate bond yield curve for such month, taking into account only that portion of such yield curve which is based on bonds maturing during the 5-year period commencing with such month." 26 U.S.C. § 430(h)(2)(C)(i).

76.     The second segment rate is determined based upon the portion of the corporate bond yield curve for bonds maturing during the 15-year period beginning at the end of the first segment rate.  26 U.S.C. § 430(h)(2)(C)(ii).

77.     The third segment rate is determined based upon the portion of the yield curve for bonds maturing after the 15-year period above used for the second segment. 26 U.S.C. § 430(h)(2)(C)(iii).

78.     These segment rates are used to calculate the funding target and target normal cost for a plan in a given year for benefits expected to be payable during the same time frames used in determining the interest rates for each segment.

---

[1] *The Pension Underfunding Crisis: How Effective Have Reforms Been? Hearing Before the H. Comm. on Education and the Workforce*, 108th Cong. 2 (2003) (statement of Rep. John A. Boehner, Chairman, H. Comm. on Education and the Workforce).

79. In turn, segment rates have a direct impact on the overall funding outlook of a plan, and on the amount of assets a sponsor must contribute each year.

80. Further fueling the perfect storm, the Moving Ahead for Progress in the 21st Century Act ("MAP-21") changed the segment rates used for calculating certain funding requirements by adding in an additional interest rate segment designed to smooth the fluctuations in interests rates through use of a longer time period of average interest rates instead of the 24-month period used to determine the corporate bond yield curve based segment rates.

81. Generally, according to the IRS, single-employer DB plans are required to use the smoothed interest rates created by MAP-21 and subsequent amendments, but, under 26 U.S.C. § 430(h)(2)(D)(ii), a plan sponsor can elect to use the monthly corporate bond yield curve instead of segment rates for funding purposes.

82. Thus, this new segment allows plan sponsors to calculate pension liability using a 25-year average of segment rates, plus or minus a corridor.

83. The corridor is a minimum and maximum percentage range above and below the 25-year smoothed segment rate that is determined by the Secretary of the Treasury on an annual basis. The initial corridor, for plan year 2012, was 10% and was set to increase by 5% each year until it reached a maximum of 30%. The increase in the corridor, however, has been repeatedly delayed. Most recently, the Bipartisan Budget Act of 2015 ("BBA") delayed the increase in the corridor so that the 10% corridor remains in effect through 2020 and will then increase by 5% to a maximum of 30% after 2023.

84. The Secretary of the Treasury calculates the 25-year average segment rate for a plan year, annually. Once that 25-year rate is determined, the corridor in effect for that plan year (currently 10%, but scheduled to increase as discussed above) is used to determine a range within which the segment rates used by plan sponsors to determine plan liabilities must fall.

85.     For example, for plan year 2019, the Secretary calculated a 25-year average segment rate of 4.15%. Using the current 10% corridor, the permitted minimum first segment rate is 3.74% (90% of the calculated rate) and the permitted maximum first segment rate is 4.57% (110% of the calculated rate).

86.     If, on a monthly basis, one of the three segment rates described above, is less than the applicable minimum percentage of the average of the segment rates for years in the 25-year period ending with September 30 of the preceding calendar year, then the segment rate described in such clause with respect to the applicable month shall be equal to the applicable minimum percentage.

87.     Conversely, if one of the segment rates is above the applicable maximum percentage of the average segment rates for the 25-year period ending with September 30 of the calendar year prior to the start of the plan year, the segment rate in question is equal to the maximum percentage.

88.     The Secretary also calculates the "single rate of interest" for each month "on the basis of the corporate bond yield curve for such month, taking into account only that portion of such yield curve which is based on bonds maturing during" each segment. 26 U.S.C. § 430(h)(C).

89.     For the month of May 2019, the 24-month average, which is the traditional ERISA calculation for segment rates, resulted in a 2.71% first segment rate, a number below the permissible minimum noted above for 2019. Thus, a plan sponsor, unless it has opted-out of MAP-21 smoothed interest rates, would utilize the minimum of 3.74%, a difference of 1.03%.

90.     The difference in segment rate is even more obvious for the longer ranges of the second and third segment rates. The 24-month average segment rates for May 2019 for the second and third segments are 3.96% and 4.45%, respectively. The minimum applicable rates for those segments in 2019 are 5.35% and 6.11%, a difference of 1.39% and 1.66%.

91.     Therefore, for purposes of determining a plan's funding target and target normal cost, a plan sponsor calculating the present value of accrued benefits within a plan for May 2019, would use a segment rate for all segments that is higher than what traditional ERISA calculations would dictate.

92.     When calculating the present value of benefits, the higher the interest rate, the lower the present value. In other words, plan liabilities are artificially lowered by using MAP-21's smoothed interest rates and corridor than what plan liabilities truly are, based on the more current 24-month segment rates that ERISA and the IRC would otherwise require.

93.     Setting aside the fact that utilizing artificially inflated rates is a temporary solution, if the calculation ended there, i.e., that plan sponsors could do nothing with the artificially increased segment rates but tout their plan's funding status, the change in calculation would at least appear beneficial. DB plans would have lower underfunded amounts. The math does not change that the plan would truly be as underfunded as it always was because current interest rates are what is actually growing plan assets despite the temporary, apparent reduction in plan liabilities.

94.     More importantly, though, because the present value determined using these smoothed rates is the basis of the funding target of the plan, which in turn is used in determining the MRC for a given year, the artificially inflated segment rates ultimately reduce the MRC. A repeatedly and artificially reduced MRC results in a plan whose funding status is slowly getting worse year after year.

95.     While the interest rate smoothing allowed plan sponsors to measure pension liabilities using a 25-year average of interest rates on those segments, because of the ever increasing corridor the smoothed rates were expected to essentially expire, eventually leaving plans even more underfunded than prior to MAP-21's implementation and requiring even higher contributions to catch up to actual plan liabilities after its expiration.

96.     Assuming the corridor is not again reset at 10% before the 5% increase in 2021, the applicable minimum segment rate will fall below the 24-month average segment rate by 2022. At that point, then, plan sponsors will utilize the traditional ERISA, 24-month interest rates as set by the Secretary of the Treasury, at least for the first segment.

97.     MAP-21, by allowing plan sponsors to calculate funding requirements based on skewed interest rates, thereby temporarily inflating their funded status and reducing their MRC each year, has deferred the eventual increased funding required to bring a plan's funded status up to par when the MAP-21 segment rates eventually expire.

98.     If a plan is using MAP-21 smoothed rates, the amendment also required an additional notice to plan participants that contains the funding percentage of a plan using traditional ERISA segment rates and comparing those rates with the funding target associated with MAP-21's rates. 29 U.S.C. § 1021.

**C.     The PBGC: Premiums and a Failing Pension Insurance Program**

99.     When enacted, ERISA also created the PBGC, which is a government agency chaired by the Secretary of Labor and whose Board also consists of the Secretaries of Commerce and the Treasury. The PBGC was established "to protect the pensions of participants and beneficiaries covered by private sector defined benefit (DB) plans."[2] It currently protects the retirement incomes of nearly 37 million American workers, retirees and their families in private-sector DB pension plans.

100.    The PBGC acts as a pension insurance policy, funded by premiums from plan sponsors, which it uses to provide reduced benefits to plan participants who could otherwise receive nothing when plan sponsors cannot meet their obligations to their pension plans.

---

[2] Congressional Research Service, Pension Benefit Guaranty Corporation (PBGC): A Primer, March 21, 2019.

101.    Nationwide, in 2017, the PBGC paid approximately $5.6 billion to more than 868,196 retirees that were participants in terminated, single-employer plans. An additional 504,687 Americans are active participants in some of those same terminated plans, and will receive their pensions from the PBGC, rather than their former plan, once they are eligible to retire.

102.    There are two types of premiums that plan sponsors pay to the PBGC: flat-rate and variable-rate. Flat-rate premiums apply to all plans while variable-rate premiums only apply to single-employer plans.  The PBGC sets both types of premiums annually.

103.    Per the PBGC's Comprehensive Premium Filing Instructions for 2019 Plan Years, the flat-rate premium is $80.00 per-participant, which is an increase from the $74.00 premium in 2018. The flat-rate premium has increased nearly every year from a low of $31.00 per participant in 2007.

104.    Variable-rate premiums are additional premiums that are paid when a plan is underfunded. These premiums are calculated based on a plan's unfunded vested benefits ("UVBs"). Variable-rate premiums are currently $43.00 per every $1,000.00 of UVBs, with a cap of $541.00, times the number of participants in the plan. In 2018, the rate was $38.00 per $1,000.00 UVBs and capped at $523.00 per participant.

105.    The chart below shows the increasing PBGC premiums for both types of premiums that affect single-employer pension plans.

| Plan years beginning in | Single-Employer Plans | | | Multiemployer Plans |
| --- | --- | --- | --- | --- |
| | Per Participant Rate for Flat-Rate Premium | Variable-Rate Premium | | Per Participant Rate for Flat-Rate Premium |
| | | Rate per $1,000 UVBs | Per Participant Cap | |
| 2019 | $80 | $43 | $541 | $29 |
| 2018 | $74 | $38 | $523 | $28 |
| 2017 | $69 | $34 | $517 | $28 |
| 2016 | $64 | $30 | $500 | $27 |
| 2015 | $57 | $24 | $418 | $26 |
| 2014 | $49 | $14 | $412 | $12 |
| 2013 | $42 | $9 | $400 | $12 |
| 2012 | $35 | $9 | N/A | $9 |
| 2011 | $35 | $9 | N/A | $9 |
| 2010 | $35 | $9 | N/A | $9 |
| 2009 | $34 | $9 | N/A | $9 |
| 2008 | $33 | $9 | N/A | $9 |
| 2007 | $31 | $9 | N/A | $8 |

106.    Sections of the U.S. Code that refer to the calculation of the PBGC premiums to be paid specifically exclude use of the MAP-21 smoothed interest rates. 29 U.S.C. § 1306. Also, ERISA requires certain underfunded plans to report specific information to the PBGC, which, pursuant to section 4010, also excludes the MAP-21 smoothed interest rates. 29 U.S.C. § 1310.

107.    Thus, for determining whether a plan is underfunded for PBGC purposes, a plan is not allowed to make the calculations based on the smoothed interest rates, but for determining the Funding Target Attainment Percentage ("FTAP") and Adjusted Funding Target Attainment Percentage ("AFTAP") for certain other ERISA purposes, including benefit restrictions and MRC, MAP-21's smoothed interest rates are authorized.

108.    Under certain circumstances, a single-employer plan sponsor may be required to pay additional annual termination premiums of $1,250 per participant per year for three years after a distress termination.

109.    For Plan Year 2015, the Plan's expenses, which include PBGC premiums, totaled $72,918,565.00. In Plan Year 2016, the expenses amounted to $83,227,992.00. For Plan Year 2017, the Plan paid $79,080,641.00 in expenses.

110.    At the end of 2018, the PBGC had a total deficit of $51.4 billion. The single-employer program has been on the Government Accountability Office's ("GAO") list of high-risk government programs since 2003.

111.    The PBGC is on that high-risk list because of three factors: (1) the decline in the number of traditional DB plans, meaning fewer plan sponsors are paying PBGC premiums; (2) "the collective financial risk of the many underfunded pension plans that PBGC insures," has increased; and (3) "premiums that [the PBGC collects] are not well aligned to the financial risk presented by the plans it insures."[3] Due to these factors, the PBGC's financial deficit has increased by nearly 45% since 2013.

112.    Aiding in the decline of DB plans, many employers are increasing the participation in DC plans, up from 8% to 31% between September 2017 and March 2018.

_____

[3] U.S. GAO Report to Congressional Committees, High-Risk Series, Substantial Efforts Needed to Achieve Greater Progress on High-Risk Areas, March 2019, at 56.

113.    The United States Bureau of Labor and Statistics reported in September 2017 that as of March 2017, 63% of private industry workers that participated in traditional DB plans were in plans that allowed new participants to qualify. Twenty-five percent of workers were in plans that no longer allow new employees to enter the plan but continue to allow current participants to accrue additional benefits, i.e., a "soft freeze." The final 12% of workers were participating in DB plans that no longer allow benefits to accrue for any participants, even those who have vested their retirement. This is called a "hard freeze."

114.    Those numbers changed in the March 2018 data. At that point, 61% of plans were still open, 25% are in a soft-freeze status (with 3% of those plans only allowing some employees to continue to accrue benefits), and 14% are in a hard freeze.

115.    These numbers must be viewed in combination: the number of workers covered by a DB plan is being reduced through lump sum offerings and plan terminations and many workers covered by still existing DB plans are no longer able to accrue benefits under those plans that continue to exist.

116.    PBGC premium rates continue to increase because the number of plans that are failing or terminating is creating obligations that continue to surpass the income from premiums and assets currently held by the PBGC.

117.    In other words, the PBGC is expected to fail in the relatively near future if current trends continue. Meanwhile, the process of de-risking a pension, described in greater detail below, and the decline of traditional DB plans are both expected to continue.

**D.    Pension De-Risking**

118.    The liability of a pension plan, expressed as a dollar figure, represents the present value of an employer's obligation to pay cash to its employees in the future. Plan sponsors arrive at this figure by estimating the expense of a plan over its life using actuarial estimates and discounting that expense to present value using discount rates tied to the pension plan's expected

rates of return on its assets. Inherent in these long-term calculations and estimates is the risk that they are incorrect and that actual liability could greatly exceed the amount originally estimated.

119.    The most common de-risking strategies following a frozen DB plan typically all end in termination of the plan. Terminating a plan removes the long-term liabilities associated with maintaining a pension from the plan sponsor's accounting. For underfunded plans, like the one here, removing a pension can drastically and immediately improve a company's financial standing and credit rating.

120.    In the last decade, plan sponsors have been focusing on decreasing these risks or de-risking pension liabilities.

121.    De-risking a pension plan refers to various ways of limiting the potential liability inherent to companies with existing pensions; it does not refer to making the pension itself safer or more stable for the participants. In order to de-risk their pensions, plan sponsors can either reduce liabilities or seek higher returns on plan assets.

122.    Though the terms "de-risking" and "risk transfer" are sometimes used interchangeably, de-risking is the overarching plan to reduce the risk to a plan sponsor created by the ongoing liabilities associated with maintaining a DB plan. Risk transfer, on the other hand, refers to removing a portion of that same risk by reducing the number of participants in a plan, thereby moving the risk from a plan to the participants or an insurer issuing an annuity.

123.    Risk transfer is typically either accomplished through lump sum offerings to participants or by purchasing annuities for a sub-set of participants or all participants.

124.    In very general terms, there are five approaches to de-risking: freezing a plan, allowing lump sum payments to terminated employees, utilizing a Liability Driven Investment ("LDI") asset management approach, transferring longevity risk via use of insurance company products (i.e., the purchasing of annuities), or some combination of the above. The Defendants have utilized some of these de-risking strategies, but not all.

125.    The PBGC's 2017 Annual Report of the Participant and Plan Sponsor Advocate, included a Pension De-risking Study ("PBGC Pension De-risking Study"), which noted that an "overwhelming majority of plan sponsors have already taken this step towards de-risking, with many doing so many years ago; the result is that the current single-employer defined benefit universe covers a smaller and smaller percentage of the workforce."

126.    The study further noted:

> The overall trend is undeniable. Regardless of the method used, it is clear that if an organization maintains a defined benefit pension plan, the data supports the fact that decision-makers within that organization are likely considering how they should be derisking their plan or are already in the process of doing so.

127.    Bear in mind that de-risking is not about making the pension more stable. Instead, the ultimate goal of de-risking is to terminate the pension plan and pay out all vested benefits to remove all pension liabilities, to both plan participants and the PBGC, from the accounting for the sponsor. The end-goal is to benefit the plan sponsor, not the pension or its participants.

128.    Indeed, the Office of the PBGC Participant and Plan Sponsor Advocate ("OPPSA") conducted a study in partnership with Mercer to analyze the causes and drivers of pension de-risking activity and recognized that plan termination is often the end goal.

129.    Plan sponsors participating in the OPPSA study acknowledged that participants in a DB plan, quite rightly, highly value those "guaranteed" benefits, and that many employees in a DC plan will never save as much money as the amount they would have accrued in pension benefits had they instead been part of a DB plan.

130.    The Plan Sponsor of the Plan has already begun the de-risking process. Removing the Plan from the company and the business operations that historically supported it is just one more route to removing the liability that an underfunded plan places on the accounting records of the Plan Sponsor and the Plan Sponsor's historical controlled group.

### 1.     Freezing Benefits

131.    As noted below, the Plan has been previously frozen. There are two ways to freeze a plan: a hard or a soft freeze. This Plan has implemented both.

132.    A soft freeze limits current employees' ability to continue accruing additional benefits. The exact terms of the freeze are dictated by a plan amendment. An employee may, for example, be able to increase their benefit amount based upon increases in salary but may not receive additional credit for years of service. A soft freeze may also only apply to certain categories of employees or it may apply to all. If a plan sponsor chooses, and if the plan is so amended, the plan may also be closed to new employees.

133.    A hard freeze prevents all employees from accruing additional benefits altogether. It, in essence, puts a complete stop to benefit accrual at the point participants are at on the date of the freeze.  No new employees may enter a plan once a hard freeze is in place.

### 2.     Lump Sum Payments

134.    Another de-risking strategy is to offer Lump Sums to plan participants at the time of their retirement or to offer Lump Sum Windows (sometimes referred to herein as "Windows") to already retired, vested employees. Plan participants eligible for a Window are typically either already drawing on their pensions or are retired but not yet eligible to draw on the pension because of their age.

135.    The PBGC Pension De-risking Study, determined using the 2011, 2013, 2015, and 2017 Mercer/CFO Research Pension Risk Surveys, showed an increase in de-risking through lump sums. In 2013, 49% of plans offered lump sums in some form. By 2017, 73% of plans offered lump sums to certain plan participants.

136.    Plan sponsors benefit by offering lump sums by reducing PBGC premiums. As discussed in more detail above, PBGC premiums are tied to the number of participants in a plan.

PBGC premiums, including both flat and variable rates, can currently be a maximum of $621 per participant, per year.

137.    Consider a male employee that retires at 66 and is expected to live, and continue to be a plan participant, until approximately 77. At the maximum PBGC premium rate, a plan sponsor would pay just short of $7,000.00 in premiums for that one employee over his remaining lifetime.

138.    For a large, closed plan, like DuPont's, with over 110,000 current participants, the aggregate future premiums could easily exceed hundreds of millions of dollars over the lifetimes of the current plan participants.

139.    The PBGC recognizes the role its premiums play in tilting the scales to a risk transfer plan for de-risking compared to other de-risking strategies within a plan, such as LDI.

140.    Many plans, the DuPont Plan included, offer a lump sum payment option at the time of an eligible employee's retirement. The Plan was also amended, twice, to allow Lump Sum Windows to retired/terminated employees no longer with the company, but not yet eligible to receive pension benefits.

141.    From the employer's perspective, lump sum payments are beneficial. Lump sums reduce the pension footprint. Each employee that elects to take a lump sum, whether at the time of retirement or through a Window, is cashed out of the plan. Those employees are no longer eligible for any benefits from the plan, the plan is no longer liable to those employees, and the plan no longer has to pay PBGC premiums for the employee.

142.    Reducing a plan's pension footprint reduces the unfunded balance sheet liability, thereby improving its comparison ratio to market capitalization. However, if markets perform well in the future, having fewer assets available in the plan means less growth potential for all plan participants because of economies of scale.

143.    Lump sum payouts also allow a plan to transfer the risk that terminated vested employees will live beyond their mortality-table-calculated life expectancies. Instead, the participants bear that longevity risk.

144.    IRC 417(e)(3) sets a statutory minimum calculation for lump sum payments. Even assuming they are calculated using current and accurate mortality tables, lump sum payments may also be lower than the life-long pension payments would be. Despite whatever early retirement subsidies are offered in the plan documents, the acceptance of a lump sum payment is a contractual agreement, and the participant, when accepting a lump sum, waives any rights to other benefits of the plan.

145.    From the employee perspective, lump sums look attractive, but advocates oppose their use for several reasons. It is generally undisputed that there is significantly less value in a lump-sum distribution than in a lifetime annuity or pension. Participants receiving a lump sum tend to underestimate their lifetime financial requirements, leaving them with less money in their later years when they are less likely to be able to return to work and earn extra income.

146.    Not the least of these concerns is that most of the people accepting lump sums likely are temporarily in need of cash rather than taking into consideration their long-term security.

**3.    Terminating a Plan**

147.    Regardless of the value of a pension to the participants, the decision to terminate a pension plan often comes down to economics for the plan sponsor. Indeed, in the same OPPSA study, discussed above, "[s]everal focus group participants reiterated that if they could reach an optimal funding level, they would execute a plan termination." Those participants cited termination as "a better alternative to maintaining a pension plan, paying administrative costs and continually seeking ways to de-risk."

148.    Thanks to federal laws in place to protect American workers, an employer must meet certain standards before it can terminate a pension plan.

149.    ERISA contains provisions that severely limit when and how a plan sponsor may terminate a pension plan, but it does not eliminate the option. As originally written, ERISA allowed employers to opt-out of contributing and transfer the plan liabilities to the PBGC at any time, but that was changed in 1987 when Congress amended the termination provisions to only allow a company to voluntarily terminate their plans if plan assets exceeded plan liabilities. This requirement is often simply stated as requiring the plan to be "fully-funded."

150.    A Plan can be terminated using the "standard termination" or a "distress termination."

151.    For a standard termination, a plan must be fully funded – it must demonstrate to the PBGC that the plan has sufficient assets to pay all of the current and future benefits owed to the plan participants.

152.    One means of quickly terminating a plan with a standard termination, is to finance fully funding the plan with other debt, like a loan, if the alternative debt has a lower interest rate than the future administrative costs associated with maintaining the pension.

153.    Once a pension plan is fully funded, a plan sponsor seeking a standard termination must either purchase an annuity from an insurance company that will pay periodic retirement benefits using plan assets that are equal to the benefits promised to participants, issue a one-time lump-sum payment to participants if the plan terms allow it, or a combination of both – if every plan participant does not choose to accept a lump sum payment, the remainder would receive an insurance-company-issued annuity.

154.    After a standard termination of a single-employer plan is completed, the company is no longer legally associated with the plan and the PBGC no longer provides any protection to the plan participants in the event of a default by the insurance company or a participant's poor investments regarding their lump sum.

155.    In the case of an annuity, state guaranty associations may offer some protection should the insurance company fail, but lump sum recipients are unprotected.

156.    If a plan is under-funded and seeks a distress termination, it must demonstrate to the PBGC that the sponsoring employer is "in financial distress and prove to a bankruptcy court or the PBGC that the employer cannot remain in business unless the plan is terminated." 29 C.F.R. § 2520.101-5, Appendix A.

157.    According to 29 C.F.R. § 4041.41, distress terminations should only be granted in one of four situations:

a.    Liquidations in bankruptcy, of the plan sponsor and every member of the plan sponsor's controlled group;

b.    Reorganization in bankruptcy, of the plan sponsor and every member of the controlled group;

c.    PBGC determination that termination is necessary to allow the employer to pay its debts when due; or

d.    PBGC determines that termination is necessary to avoid unreasonably burdensome pension costs caused solely by a decline in the employer's work force.

158.    If the distress termination application is granted, the PBGC will take over and become the trustee, paying plan benefits in a reduced amount using both remaining plan assets and PBGC guarantee funds.

159.    Though it does not occur often, the PBGC can also initiate a form of distress termination called an involuntary termination. The result is the same as if the company initiated the distress termination – the PBGC takes over as trustee and the plan beneficiaries receive reduced benefits in accordance with the PBGC guidelines.

160.    Once a plan is terminated through involuntary or distress proceedings, the PBGC receives a lien in the property of the employer and its affiliates for the underfunded portion of the plan, capped at 30% of the combined net worth of their total property. ERISA § 4068, 29 U.S.C. §

1368(a). If the termination occurs as part of a bankruptcy proceeding, though, the PBGC is unable to perfect its lien and remains an unsecured creditor, making a full recovery very unlikely. The PBGC charges a surcharge per participant each year for three years following a termination in bankruptcy.  ERISA §4006(a)(7), 29 U.S.C. §1306(a)(7).

161.    Outside of bankruptcy, few companies seek distress termination (and the PBGC rarely initiates involuntary terminations). When it does happen, the PBGC has more options than a discharge in bankruptcy. Aside from the ability to perfect its lien, the PBGC may later restore the terminated plan to the employer if the employer has a significant financial improvement.

162.    Thus, absent fully-funding the plan or convincing an insurance company to enter into a pension risk transfer agreement and issue an annuity paid for with assets that are not nearly sufficient to meet the future obligations of the plan, the only way a single-employer plan sponsor can avoid the pension liabilities of an underfunded plan is a distress or involuntary termination – typically accomplished through bankruptcy or liquidation.

163.    According to a Congressional Research Service report in March 2019, the PBGC insured approximately 25,000 DB pension plans in 2018, covering approximately 37 million workers. In the same year, the PBGC became the trustee for 58 newly terminated single-employer plans and provided 6 multiemployer pension plans with financial assistance. It also provided benefits to 861,371 participants from 4,919 previously terminated single-employer plans and 62,300 participants in 78 multiemployer plans.

164.    On the other hand, when annuities are purchased by a plan sponsor, the insurance company ends up with full responsibility for ensuring the plan assets are sufficient to provide the promised benefits to the plan participants.

165.    For lump-sum distributions, plan participants are left on their own to ensure the payment they receive is properly invested or otherwise stretches long enough to provide the equivalent of the lifetime benefits the participant would have received from the pension.

166.    Both situations leave vulnerable employees, those of an age that are unlikely to return to work should the insurance company fail or the lump sum turn out to be insufficient to provide for their lifetime needs, with limited protection. Neither the employer nor the PBGC have any responsibility to the participants in either situation.

167.    The PPA, however, does not allow the payment of total lump sum benefits if the plan's funding status is less than 80%. Paying out lump sums to beneficiaries removes a future liability from the plan, but essentially makes the liability current and thus destabilizes the plan.

168.    The restriction on lump sum payments is intended to prevent a mass lump sum election, either through a Window or under plan terms that allow a participant to make a lump sum election upon retirement, which would significantly reduce the assets in the plan that are left to meet the obligations to the remaining participants.

169.    Other corporate actions can also affect the stability of pension plans.  For example, recognizing that mergers and acquisitions are common and could affect pension plans, ERISA contains a provision to address and protect participants in the event of mergers and consolidation of plans or transfer of plan assets.  29 U.S.C. § 1058.

**E.    The DuPont Plan**

170.    Defendant Historical DuPont originally adopted its pension plan documents on September 1, 1904, making the Plan one of the oldest private pensions in the United States at 114 years old.

171.    In 2007, Historical DuPont closed the U.S. pension plan to new employees.  As a closed Plan, sometimes called a soft freeze, the Plan still exists and liabilities continue to accrue. Employees participating in a closed plan who are already eligible for benefits can continue to earn greater benefits – the monthly payment that the employee qualifies for at the time the plan is closed can continue to increase.

172.    On December 11, 2015, Historical DuPont announced a merger with Historical Dow in an all-stock transaction. As part of the merger, Historical Dow shareholders received a fixed exchange ratio of 1.00 per share of DowDuPont for each Historical Dow share, and Historical DuPont shareholders received a fixed exchange ratio of 1.282 shares of DowDuPont for each Historical DuPont share.

173.    As part of the preparation for merger, the two companies and their boards planned how to deal with their combined $51 billion in pension obligations. That strategy included, from its inception, an intention to merge the companies, then later divide into three separate, unrelated entities.

174.    Although, at the time of the merger announcement, the companies may have already decided which of the three yet-to-be-formed companies would maintain the Plan liability, no announcement to employees regarding that responsibility was made until nearly three years later – on November 1, 2018.

175.    The timing of the decision regarding the intended shift in pension liability is demonstrated by certain SEC filings made by the companies in anticipation of the merger and the Plan amendment immediately following the announcement of the intended merger.

176.    In a May 2016 Fact Sheet filing containing updates on the Plan and Answers to Questions Historical DuPont alleges to have received regarding the Plan, Historical DuPont indicated that the trust containing the Plan assets was and would remain separate from Historical DuPont. In responding to a question regarding what would happen to the Plan after the merger and separation, Historical DuPont stated:

> In terms of the allocation of pension liabilities and related assets following the intended separations of the combined company into three companies, we will work thoughtfully and diligently to review and consider all of the factors and elements that will need to take place *as we transition the pension to the new companies*. Importantly, we will continue to fund the pension plan in accordance with all the legal requirements, as we always have, and the amounts of existing pensioners' benefits will not change, *even if over time the name of the company that*

*administers the benefit changes*. Additionally, the accrued benefit for active employees will not be reduced.

The intended separations will be consummated as soon as practicable following the consummation of the merger, but the consummation of such separations is not expected to exceed 18-24 months following the closing of the merger. The closing of the merger is expected to take place in the second half of 2016. *At this time, no final decisions have been made as to the allocation of pension liabilities and related assets following the intended separations*.

177.    This document, filed by Historical DuPont and Historical Dow, demonstrates both the Boards of the two, still-separate, Historical companies were working together to determine the ultimate position of the assets and liabilities of the Plan and decision-making authority over the Plan assets. It confirms the original intention to move the Plan assets and liabilities away from the Historical company as part of the intended separation into the three companies.

178.    These announcements and statements demonstrate that major changes to the Plan were under serious consideration prior to the announcement of the decision to merge the two Historical companies into one and then divide into three wholly separate corporate entities.

179.    The amended and restated version of the full Plan, dated December 16, 2015, purports to permit the "Merger or Consolidation of Plan or Transfer of Assets." In that paragraph, the Plan allows the Company to transfer the assets of the Plan to another pension plan, provided Section 414(l) of the IRS Code is satisfied. Section 414(l), though, only applies where two or more plans are combining under the control of one plan sponsor.  No second plan was involved in this transaction and, therefore, no "transfer" under ERISA or the Plan documents occurred.

180.    The Plan does not otherwise authorize the transfer of plan assets to another company, a change in plan sponsor, or an alteration to the controlled group. Making such changes would, therefore, require a plan amendment.

181.    Further, "Management of Plan and Assets" requires that "All contributions to provide benefits under this Plan shall be made by the Company."

182.    "Company" is defined in the Plan to mean "E. I. du Pont de Nemours and Company and/or any wholly owned subsidiary or part thereof which adopts this Plan with the approval of the Administrative Committee, or such person or persons as the Administrative Committee may designate."

183.    The Plan, thus, requires any contributions to the Plan come from Historical DuPont or one of its subsidiaries, not from the newly formed parent corporation of Historical DuPont.

184.    After the shift to Corteva, Historical DuPont, which was divested of the majority if not all of its assets and historical business operations as part of the separation from DowDuPont, does not have the ability to make those required contributions.

185.    Additionally, under the Plan, "controlled group" is defined as "E. I. du Pont de Nemours and Company and its controlled group of corporations within the meaning of Section 1563(a) of the Code."

186.    The Plan documents do not include a provision allowing a change in controlled group. Thus, the shift of all Plan assets and liabilities to the new company, Corteva Agriscience, at the same time as removing most if not all of the Plan Sponsor's business operations leaving the Plan Sponsor unable to meet its obligations, is in violation of the Plan documents.

187.    In the Third Amendment to the Plan, dated December 12, 2016, wherein benefits were frozen, language was added to the Plan documents defining the "Benefit Freeze Date" as the earlier of either November 30, 2018 or the date after the merger of E. I. du Pont de Nemours and Company and the Dow Chemical Company, "the closing date of the transaction on which substantially all of the business operations consisting of such entity or entities . . . cease to be a part of the controlled group (as defined in Sections 414 (b) and (c) of the Code) of the company sponsoring the DuPont Pension and Retirement Plan . . .."

188.    This language further supports that the intention of the Defendants, from some date prior to this amendment and prior to the announcement of the merger, was to divest Historical

DuPont of business operations and separate the assets and liabilities of the Plan from the controlled group associated with the newly merged Historical Dow and Historical DuPont.

189.    The merger of Historical Dow and Historical DuPont was completed, according to an announcement by DowDuPont, on September 1, 2017. In this same announcement, Andrew Liveris, then executive chairman of DowDuPont and Ed Breen, Chief Executive Officer of DowDuPont both made clear the intent to combine and then divide into three separate companies.

190.    Immediately after the merger, the combined company operated as a holding company with three divisions: Agriculture, Materials Science, and Specialty Products.

191.    Again, these announcements point to the already-in-place strategy to divest the historical companies of the $5 billion in unfunded pension liabilities in the Plan.

192.    More recently, in 2018, and as part of the benefit freeze amendment discussed below, DuPont implemented a hard freeze of the Plan, wherein all participants under the Plan would stop accruing new or increased benefits. In other words, a person qualified under the Plan to receive benefits, could not increase their monthly payments by any means.

193.    Historical DuPont also announced that any participant under the age of 50 as of the freeze date, November 30, 2018, would no longer be eligible for medical, dental, and life insurance benefits as had been previously promised.

194.    At the time of this announcement, although Historical Dow and Historical DuPont had already merged, it was not publicly stated which of the three companies to be created after the intended division would shoulder the liability of the Plan. With over 121,000 pensioners in the plan, the total Plan liability exceeded $19 billion as of December 31, 2017.

195.    The question of which company would have responsibility for the Plan was the subject of much news coverage and speculation. Combined, Historical Dow and Historical DuPont had $51 billion in pension obligations.

196.    On November 1, 2018, DuPont announced to Plan participants that the heritage U.S. DuPont pension and retiree benefit obligations, medical, dental and life insurance plans (of those participants over the age of 50 who remained eligible), would be assumed by Corteva Agriscience on June 1, 2019. The New Dow would assume responsibility for all heritage Dow Chemical U.S. pension and retiree benefit obligations.

197.    According to the notice, "Corteva Agriscience . . . is designed to be one of the world's most competitive pure play agriculture companies."

198.    In recognizing that "[i]ncreases in pension and other post-employment benefit plan funding obligations may impair [Corteva's] liquidity or financial condition," Corteva acknowledged that, through its ownership of Historical DuPont, Corteva "will continue as sponsor for the entire plan regardless of whether participants, including retirees, are or were associated with Historical DuPont's agriculture business."

199.    The shift of the Plan from the DowDuPont family to Corteva is a change in controlled group under the IRS Code. Though advance notice may or may not have been required to the PBGC, a change in controlled group is a mandatory report event because it "may signal financial problems and could potentially put pensions at risk."

200.    A plan sponsor's controlled group is important for many reasons, not the least of which is because companies within the same family normally share responsibilities for employee benefits amongst themselves. Reflective of this, the IRS treats separate businesses within a controlled group as one employer for most pension-related activities.

201.    Controlled groups also play an important role in temporary substantial business hardship requirements and in plan termination. As discussed above, to qualify for a temporary substantial business hardship, which would relieve the sponsor of the annual MRC requirement, all members of the controlled group must qualify. As for termination, there are only four situations

that meet the PBGC guidelines for distress termination, two of which require both the plan sponsor and each member of the sponsor's controlled group to satisfy the standard.

202.    By changing the landscape of the controlled group, the Defendants have freed the Defendants outside of Corteva's controlled group from the calculations for a substantial business hardship and for potential termination, making both options easier to achieve.

203.    ERISA's employee protective purpose does not contemplate stripping a plan sponsor of all business activities so that it is no longer a going venture, leaving it as a shell company with no means of contributing to or supporting the plan.

204.    As discussed more fully above, ERISA contains a merger provision that prevents a merger unless the participants' benefits will not be reduced post-merger from what they would have been pre-merger.

205.    When an underfunded plan, no matter what its funding level is (and regardless of whether or not that funding level is calculated using MAP-21 segment rates), terminates, because of the PBGC limitations and restrictions on benefits, the termination "imposes an *immediate and permanent loss of income* on many retirees and other plan participants."

206.    This immediate loss is twofold. First, once the PBGC becomes the trustee of a plan, the participants are subject to the statutory maximum benefit payable by the PBGC. Participants receive the lower of their benefit as calculated under the plan or the statutory maximum benefit.

207.    Although the PBGC no longer discloses those losses, its most recent report showed a substantial increase in the amount of vested benefits permanently lost, up to 28% on average, per participant, among the one in seven retirees and participants that lose earned benefits when the PBGC takes control of a terminated pension plan.

208.    Participants in single-employer plans terminating in 2019 may receive up to $67,295 per year if they begin taking their pension at age 65. The PBGC payment amount varies depending on the age at which the participant begins drawing their pension and on the form of the

benefit. For example, the maximum benefit for a participant is reduced for participants with joint and survivor benefits.

209.    Thus, if a merger or transfer of pension plan assets and liabilities puts a plan at a greater risk of termination, it automatically places the participants at a higher risk of losing substantial amounts of their benefits.

210.    Spinning-off underperforming units of a company into separate companies is a well-established type of financial engineering that is made even more desirable when the spinoff can remove the legacy pension from the books of the original plan sponsor.

211.    In this case, took a more convoluted tact than a straight spinoff.  The Defendants are left the original, though now nominal only, Plan Sponsor in place but changed the Plan Sponsor's controlled group, removing all the business activities that formerly supported the Plan, adding litigation liabilities from agricultural activities stemming from both historical companies, removing "approximately $6 billion of net defined pension plan and other post-employment benefit obligations, as of December 31, 2018, that are expected to be retained by Corteva," creating an immediate gain for the Defendants outside of Corteva's controlled group.

212.    Because the Plan liabilities dwarf the Plan assets, by more than $5 billion, this shift of the Plan liabilities into a new controlled group, is in the best interest of Historical Dow, Historical DuPont, DowDuPont, their boards and board members, but not in the best interest of either the Plan or its participants and beneficiaries.

213.    Here, Corteva is taking on the bulk of the Historical companies' agricultural sector litigation liabilities and a multi-billion dollar deficit in the form of an underfunded pension liability.

214.    This is not the first time DuPont has transferred liabilities to a spinoff company. Indeed, there is current litigation between a previously spun company, Chemours, and Historical DuPont. Chemours was spun off from DuPont in 2015.

215.    That complaint was filed under seal by Chemours against Historical DuPont, DowDuPont, and Corteva, on May 13, 2019. The suit was filed with a cover sheet that notes the case involved an "action for declaratory judgment and other relief relating to a spin-off transaction."

216.    When Chemours spun, there were indemnification agreements back and forth between the companies involved, much like the arrangement with Corteva.

217.    Since Chemours was spun, there have been multiple toxic tort class actions filed alleging the chemical company leaked chemicals into the surrounding water, tainting the water source and exposing residents along the Cape Fear River in North Carolina to GenX and causing extensive health problems.

218.    According to those suits, GenX was introduced in 2009 as an allegedly safer alternative to perflurooctanoic acid ("PFOA").

219.    DowDuPont recorded an indemnification asset on its 2017 Form 10-K related to these matters of $242 million.

220.    Similarly, in 2004, DuPont sold its nylon manufacturing business to Koch Industries Inc.  Koch later audited 12 of the plants and found 680 regulatory violations, that it then reported to the U.S. Environmental Protection Agency. Following those reports, the EPA levied a $1.7 million civil fine against Koch and Koch agreed to pay $500 million to correct environmental problems at the plants in seven states.

221.    Koch sued DuPont to recover the cleanup costs, alleging it had been misled regarding the health and safety of the plants. DuPont counter sued Invista, the division of Koch that maintained the plants, arguing that Invista had violated the terms of the contractual agreement relating to environmental indemnification. The two announced a settlement regarding the litigation in June 2012.

222.    In both situations, and much like is happening here, DuPont knowingly shifted looming environmental liabilities to a wholly separate company, insulating Historical DuPont behind limited indemnification agreements, allowing the historical company to avoid the bulk, if not all, of the liability for damages that it caused.

**F.      The Plan's Funding Status**

223.    As part of MAP-21, companies utilizing the alternative calculation are required to provide a Supplemental Notice pursuant to 29 U.S.C. § 1021(f) regarding the funding status of the plan. In Historical DuPont's Plan Year 2017 supplemental disclosure, the company provided the following chart:

| | Information Table | | | | | |
|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2015 | |
| | With Adjusted Interest Rates | Without Adjusted Interest Rates | With Adjusted Interest Rates | Without Adjusted Interest Rates | With Adjusted Interest Rates | Without Adjusted Interest Rates |
| Funding Target Attainment Percentage (FTAP) | 85.14% | 71.62% | 91.18% | 76.50% | 93.94% | 77.42% |
| Funding Shortfall (FS) | $2,425,129,633 | $5,506,740,502 | $1,464,898,976 | $4,655,821,042 | $984,924,691 | $4,458,069,101 |
| Minimum Required Contribution (MRC) | $201,442,473 | $811,403,404 | $215,366,913 | $711,269,260 | $226,743,266 | $781,414,654 |

224.    The chart demonstrates both the decreasing funding status – the impact of repeated years of underpayments – in the form of a downward trend in funded percentage (using both the adjusted rates and the unadjusted rates) and the dramatic differences in the magnitude of both the funding shortfall and the MRC between the two calculations.

225.    The downward funding trend was recently confirmed in the Supplemental Notice for Plan Year 2018, as seen below:

| Information Table | | | | | | |
| | 2018 | | 2017 | | 2016 | |
| | With Adjusted Interest Rates | Without Adjusted Interest Rates | With Adjusted Interest Rates | Without Adjusted Interest Rates | With Adjusted Interest Rates | Without Adjusted Interest Rates |
|---|---|---|---|---|---|---|
| Funding Target Attainment Percentage (FTAP) | 80.36% | 68.67% | 85.14% | 71.62% | 91.18% | 76.50% |
| Funding Shortfall (FS) | $3,207,274,285 | 5,985,437,970 | $2,425,129,633 | $5,506,740,502 | $1,464,898,976 | $4,655,821,042 |
| Minimum Required Contribution (MRC) | $485,052,118 | $916,950,114 | $201,442,473 | $811,403,404 | $215,366,913 | $711,269,260 |

226.    The Plan went from a high in 2015 of 77.4% using traditional ERISA funding calculations and 93.94% utilizing MAP-21 calculations to a low in Plan Year 2018 of 68.67% using traditional ERISA calculations and 80.36% with MAP-21 numbers.

227.    Despite the underfunded status of the Plan, a Plan amendment signed by the Director of Global Rewards and dated October 25, 2016, allows a Voluntary Lump Sum Window with a maximum potential payout of $675 million.

228.    The amendment allows "Qualified Former Employee[s]" to receive either a lump sum payment or an annuity in the place of their pension payment.

229.    Qualified Former Employees are defined in the amendment, with few exceptions, as "any former employee who is either entitled to and, as of the Window Calculation Date, is eligible to commence a Title I, Section V vested benefit or who is entitled to, but as of the Window Calculate Date, is not yet eligible to commence a Title I, Title III, Title IV or Title VII vested benefit." In other words, the amendment permitted retirees that were vested but not yet in pay status, to receive a lump sum or annuity in exchange for giving up all rights to any pension benefits and protections.

230.    The window within which retirees were required to request the lump sum began September 12, 2016 and ended October 12, 2016.

231.    In 2017, the Plan was amended again to allow a second Voluntary Lump Sum Window for an identically-defined group of Qualified Former Employees.

232.    That amendment was signed by the same Director of Global Rewards and dated November 17, 2017.

233.    For this 2017 amendment, the Window Election Period was September 11, 2017 to October 20, 2017. Unlike the 2016 Window, the 2017 Window was uncapped.

234.    Corteva's filed Form 10-K with the SEC discloses that payments under the 2016 Window resulted in disbursement of approximately $550,000,000.00 and the 2017 Window disbursement was approximately $140,000,000.00.

235.    Corteva's Form 10-K also reported a potential cause of the Plan's chronic under-funding: "Unless required by law, Historical DuPont does not make contributions that are in excess of tax deductible limits."

236.    Further, the 10-K notes that "Historical DuPont does not expect to make contributions to the principal U.S. pension plan in 2019."

237.    Reflecting this overarching position regarding pension funding, from January 1 through August 31, 2017, Historical DuPont made $2.9 billion in contributions to the Plan, of which it denominated $2.7 billion as "discretionary contributions." This discretionary contribution was funded by a May 2017 Debt Offering (an underwritten public offering $1.25 billion of Historical DuPont's 2.20 percent Notes due 2020 and $750 million of Historical DuPont's Floating Rate Notes due 2020), short-term borrowings, including commercial paper issuance, and cash.

238.    This contribution was then taken as a deduction on Historical DuPont's 2016 federal tax return and resulted in a net operating loss for tax purposes that tax year. This operating loss meant that, on paper, Historical DuPont overpaid approximately $800 million in taxes during 2016.

239.    Historical DuPont's Form 10-K for 2016, on the other hand, notes a 26% increase in income from continuing operations of $3.3 billion, before taxes.

240.    A portion of that federal tax overpayment created by the pension contribution deduction was applied against the 2017 tax liability and the remainder generated a refund of approximately $700 million for the 2016 tax year, which was received in the fourth quarter of 2017.

241.    In September 2018, DowDuPont contributed $1.3 billion to the Plan (and an additional $1.7 to the Dow pension plan). Of this, $1.1 billion was a discretionary contribution, which can again be applied against any tax liabilities or payments.

242.    Despite both of these contributions, that Historical DuPont repeatedly points to as demonstrative of their commitment to the pension, as seen above in the Supplemental Notice, the Plan's funded status continues in a downward spiral.

243.    DuPont's activities in relation to the Plan prior to the merger, after the merger, and now as part of this separation, are the culmination of a long-term de-risking strategy designed to minimize or eliminate its funding responsibilities. The strategy will end with the Plan, should it even continue to exist, being entirely on the books of a separate controlled group where none of DuPont's Plan participants were ever employed; a company that owes no debt of gratitude to the participants for years of dedicated service to build the company; and one that is also saddled with the ongoing financial liabilities of the recent and upcoming environmental lawsuits.

244.    ERISA allows a change in controlled group, as evidenced by the PBGC's reporting requirement, but it does not contemplate removing an entire plan from the responsibility of the long-running plan sponsor's business operations and dumping it on an unrelated, newly-created company.  Nor does ERISA contemplate a plan sponsor being left with no business operations and serving as, essentially, a shell company within a new controlled group and unable to meet its funding obligations from its business operations.

245.   The Defendants' de-risking strategy has left the Plan in a difficult financial situation where it may not be able to recover.

246.   ERISA section 101(f) requires certain annual funding notices be provided to participants and beneficiaries of each Plan. 29 U.S.C. § 1021. This section requires the notice to contain a statement "as to whether the plan's funding target attainment percentage (as defined in section 1083(d)(2) of this title) for the plan year to which the notice relates, and for the 2 preceding plan years, is at least 100 percent (and, if not, the actual percentages). . .."

247.   Throughout this time of continuing decreases in funding status, DuPont has repeatedly tried to assuage the fears of Plan participants by making such obviously incorrect, incomplete, and misleading statements as:

a.   were it not for federal laws regarding certain contributions, "the funded percentage would be over 100%";

b.   In response to the question "Is my pension secure?" the Plan Sponsor regurgitated trust law and deflected the participants into believing the plan assets were safe from creditors, but did not address the $5.5 Billion shortfall in plan funding that affects the security of pensions;

c.   When responding to a question regarding the Plan's ability to fulfill its pension obligations, the Plan again misdirected participants with an answer pointing to the Plan's payment of benefits in the past and ability to meet current payment obligations.

248.   In an April 2019 cover letter and "Pension Announcements – FAQs," Historical DuPont responded to a question regarding whether the "continued sponsorship" of the Plan "by Corteva Agriscience [would] affect future pension contribution requirements" with "[t]he assignment of Plan sponsorship to Corteva Agriscience does not affect future funding or contribution requirements."

249.   First, it appears that there has been no "assignment" of Plan sponsorship as there has been no change in Plan Sponsor. Second, because the Defendants removed all business operations from the actual Plan Sponsor and shifted that newly-empty company with all the Plan

assets and liabilities to a different controlled group, shielding both historical companies from pension liability, the change reasonably could affect future funding and contribution requirements.

250.    In the same FAQ section, DuPont provided alternative calculations regarding funding status of the plan, claiming that after making a $1.1 billion discretionary contribution in September 2018, the funding status reported in the previous year's 2017 Form 10-K would be different. "With this additional discretionary contribution, the funding ratio for the 10K is increased from 82% at year-end 2017 to 88% (assuming no change in other assets and liabilities from year-end 2017)."

251.    This statement regarding plan funding status is purposefully inaccurate and misleading. As noted in the tables above, the actual funding status for the Plan decreased from plan year 2017 to plan year 2018, despite any discretionary contributions made by any of the Defendants.  Informing Plan participants in April 2019 that an alternative set of calculations, on a different date, and without regarding to any changes in plan liabilities or assets since the earlier disclosure, somehow increased the funded status of the Plan is misleading and inappropriate.

252.    The disclosure regarding the Plan's funded status makes the FAQ a formal disclosure of the plan, requiring the disclosure to contain accurate information regarding the Plan's funded status.

253.    Responses like the above are misleading and negligent at best and provide a false sense of security to Plan participants. At worst, the Defendants' statements are intended to lead Plan participants into believing their pension is safe and properly funded, which deprives them of material facts they would need to have in order to properly consider, among other possible actions, whether to remain in the Plan or accept a lump sum when one is available.

254.    In reality, without the use of the falsely smoothed interest rates, as reflected in the charts provided in the separate supplemental notices, for 2017, the Plan had a funding shortfall of more than $5.5 Billion, which increased to more than $5.9 Billion in 2018.

**G.      Corteva, the Plan's New Parent Corporation**

255.    The Form 8-K filed by New DuPont on June 3, 2019, describes Corteva as "a separate and independent public company" that was previously a "wholly owned subsidiary" of New DuPont.

256.    Historical DuPont's Form 8-K, filed on the same date, acknowledges that as part of a "series of internal reorganizations," DowDuPont "contributed all of the outstanding common stock of E. I. du Pont de Nemours and Company ('Historical DuPont') to Corteva.  As a result, Historical DuPont is now a subsidiary of Corteva. . .."

257.    According to the Form 10 filed for Corteva, approximately 3,550 lawsuits brought against Historical DuPont and Chemours involving perfluorooctanoic acid and its salts, including the ammonium salt ("PFOA"), found in drinking water, were consolidated in a multi-district litigation ("MDL") alleging personal injury as a result of ingestion.

258.    The MDL was settled in early 2017 for $670.7 million in cash, with Chemours and Historical DuPont (without indemnification from Chemours) each paying half.

259.    Corteva's Form 10, in describing "Corteva's Relationship with New DuPont and Dow Following the Distribution," Corteva notes that:

> In connection with the separation of Dow and us from DowDuPont, we have assumed and will assume, and will indemnify New DuPont and Dow for, certain liabilities including, among others, certain environmental liabilities and litigation liabilities relating to our business and the discontinued and divested businesses and operations of Historical DuPont. ***Most of these indemnification obligations are uncapped***, and may include, among other items, associated defense costs, settlement amounts and judgments. ***Payments pursuant to these indemnities may be significant*** and could negatively impact our business, financial condition, results of operations and cash flows.

260.    Corteva also recognized that the separation itself could materially and adversely affect the financial condition and results of its operations. In fact, as a result of the separation, expected benefits under the Plan could either be delayed or not come to fruition at all.

261.    Further, Corteva acknowledged that it has accepted "significant indebtedness" in connection with the separation from DowDuPont that were historically covered by Historical DuPont's operations, but Corteva "will not be able to rely on any of the earnings, assets or cash flows that are attributable to Historical DuPont's materials science and specialty products" because those have been transferred to New Dow or New DuPont.

262.    Also, the Form 10 notes that Corteva incurs "environmental operating costs for pollution abatement activities including waste collection and disposal, installation and maintenance of air pollution controls and wastewater treatment, emissions testing and monitoring and obtaining permits" primarily from Historical DuPont.

263.    Historical DuPont records "[a]ccruals for environmental matters . . . when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated." The 2016 Form 10-K recorded a liability of $457 million as of the end of December 2016 but recognized the potential liability for that recording could range up to $900 million above that recorded accrual. The 2016 Form also includes expected payments for environmental remediation of $134 million in 2018-2019, $80 million in 2020-2021, and $75 million in 2022 and beyond.

264.    In the same section of DowDuPont's 2017 Form 10-K, the company recorded an accrued $1.31 billion for "probable environmental remediation and restoration costs" and recognized that number could be up to two and a half times the estimated accrual. Because the potential liability was so high, Historical DuPont recognized that "it is reasonably possible that environmental remediation and restoration costs in excess of amounts accrued could have a material impact on the Company's results of operations, financial condition and cash flows."

265.    Upon information and belief, Corteva has accepted these and other environmental remediation obligations as part of its separation from DowDuPont.

266.    Perhaps more troubling, Corteva's filings do not directly mention potential glyphosate liabilities, but both DuPont and Dow manufacture glyphosate-based herbicides, similar to Roundup. Dicamba, another herbicide faced with substantial litigation because of its drift potential to neighboring farms, is also a DowDuPont product.

267.    As both products are agricultural, it is assumed both the production and liabilities associated with each will also be transferred to Corteva.

268.    Because the Plan is in a hard freeze and no new participants may enter, no Corteva employee will ever qualify to receive benefits under the Plan as a Corteva employee. At the end of Plan Year 2017, the total number of participants and beneficiaries covered by the Plan was 121,174. Of those, 13,009 were current employees, 85,531 were retired and receiving benefits while 22,634 were retired and vested, but not yet receiving benefits.

269.    In other words, at most and only if every active employee was transferred to Corteva (which did not and will not happen), of the 121,174 plan participants, only 13,009 could ever be employed by Corteva. The remaining 108,165 are no longer employed, whether or not they are currently receiving benefits. That equates to a maximum of only 12% of the Plan participants ever possibly being employed by the new corporation with ultimate responsibility for Plan funding.

270.    According to a Pension and Retirement Plan Presentation for U.S. DuPont Retirement-Eligible Employees Transitioning to "New" DuPont on June 1, 2019, and presented in March 2019, any employees that were current employees and transferring their employment to the New DuPont (i.e., every employee whose job duties were not transitioned to Corteva or New Dow) and who are at least aged 50 with 15 years of eligible service "are **automatically** considered a retiree under the Plan."

271.    Should these new retirees be eligible and choose to immediately begin to receive pension payments, the benefit payments for those employees who are automatically deemed retired

fall into the first segment and Defendants should use those first segment rates to calculate the Plan's current funding status.

272.    With that in mind, whether Defendants will use or did use the correct segment rate in determining plan liabilities is yet to be determined.

273.    The shift of plan assets and liabilities to Corteva is a prohibited transaction pursuant to 29 U.S.C. § 1106(a) and (b).

274.    A prohibited transaction is one in which a fiduciary causes the plan to engage in a specified transaction with a "party in interest" unless it can prove that a statutory exemption applies to the transaction.

275.    For example, a fiduciary may not directly or indirectly sell, exchange, or lease property between the plan and a party in interest.

276.    A fiduciary also may not directly or indirectly lend money or extend credit between a plan and a party in interest.

277.    Nor may a fiduciary directly or indirectly furnish goods, services, or facilities between a plan and a party in interest.

278.    The direct or indirect transfer to, or use by, or for the benefit of a party in interest any assets of the plan is likewise prohibited.

279.    Finally, the direct or indirect acquisition, on behalf of the plan, of any employer security or employer real property is a prohibited transaction.

280.    Among other things, a party in interest is a fiduciary of the plan and an employer, any of whose employees are covered by the plan.

281.    A fiduciary is prohibited from transferring plan assets for the benefit of a party in interest of the plan.

282.    If, then, the transfer of the Plan's assets (and the necessarily accompanying liabilities in this case) to another, wholly unrelated company, benefits a party in interest, the transfer is prohibited.

283.    As discussed throughout, both Historical DuPont and DowDuPont benefit from the immediate removal of the Plan liability from the assets and liabilities of the companies. The $5.5 billion in underfunding and the total $19 billion in pension Plan liabilities as of December 31, 2017 were immediately removed from the books of all other Defendants and no longer affect those Defendants outside the controlled group of Corteva.

284.    The Plan's fiduciaries knew or should have known that the transfer of the plan assets to Corteva would directly and/or indirectly benefit the Defendants outside of Corteva's controlled group, at the expense of the Plan and its participants.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### (Breach of Fiduciary Duty, 29 U.S.C. § 1104)

285.    Plaintiffs and the class repeat and re-allege the foregoing paragraphs as if fully set forth herein.

286.    As set forth in this Complaint, the Defendants have repeatedly breached their duties of prudence and loyalty.

287.    The Defendants concocted a scheme, the intent of which was to remove the Plan liabilities from the accounting and reporting for the newly-created, reincarnated Historical companies.

288.    The decisions made in furtherance of this scheme were in the self-interest of the companies and certain executives and not in the best interest of the Plan or the Plan participants as is required by ERISA.

289.    Thus, as described herein, the Defendants have repeatedly breached their duties of prudence and loyalty pursuant to 29 U.S.C. § 1104.

290.    Accordingly, the Plaintiffs are entitled to injunctive relief requiring the return of the Plan assets and liabilities to the reincarnation of the company that created it, New DuPont, full-funding of the Plan, and other relief, including, but not limited to, damages resulting from the breaches of duty as described herein.

**COUNT II**
**(Failure to Follow Plan Documents, 29 U.S.C. § 1104)**
**All Defendants**

291.    Plaintiffs and the class repeat and re-allege the foregoing paragraphs as if fully set forth herein.

292.    As set forth in this Complaint, the Defendants have repeatedly violated the Plan documents.

293.    The Plan documents do not contemplate, nor do they authorize, the evisceration of the business activities of Historical DuPont and the shift of the Plan Sponsor, along with the Plan assets and liabilities, to a newly-created company and controlled group.

294.    By removing Historical DuPont's business activities, leaving it a shell corporation, Historical DuPont is no longer able to make the contributions that the Plan documents require be made by the Plan Sponsor, Historical Dupont.

295.    Both actions are violations of the Plan documents.

296.    Accordingly, the Plaintiffs are entitled to injunctive relief and other relief, including, but not limited to, damages resulting from the breaches of duty as described herein.

**COUNT III**
**(Breach of Disclosure Duty, 29 U.S.C. § 1021 and 1132)**
**Historical DuPont, DowDuPont, and Their Respective Boards and Board Members**

297.    The Plaintiffs and the class repeat and reallege the preceding paragraphs as if fully set forth herein.

298.    As set forth in this Complaint, the Defendants' annual Plan notices and other disclosures are deceptive and fail to sufficiently advise participants of the status of the Plan.

299.    The notices and disclosures are, therefore, deficient and the Defendants have failed to comply with the notice requirements of ERISA, 29 U.S.C. § 1021(f).

300.    The notices and other disclosures, additionally, fail to properly inform Plan participants of the funding policy of Historical DuPont in violation of 29 U.S.C. § 1021.

301.    Accordingly, the Plaintiffs are entitled to injunctive relief, statutory penalties, and other relief, including, but not limited to, damages resulting from the breaches of duty as described herein.

**COUNT IV**
**(Breach of Disclosure Duty and Failure to Notify Plan Participants Regarding the Serious Consideration of Major Changes to the Plan 29 U.S.C. § 1021 and 1132)**
**All Defendants**

302.    The Plaintiffs and the class repeat and reallege the preceding paragraphs as if fully set forth herein.

303.    As described herein, the Defendants' strategy to merge the Historical companies and later divide into three wholly-separate companies included an intent to eviscerate the Plan Sponsor and leave the Plan so underfunded that it is at an increased risk of failure.

304.    Additionally, and as described herein, once the decision regarding the Plan was finalized, the Defendants had a second, affirmative duty to disclose the full information to participants that they needed in order to protect their interests.

305.    The Defendants failed to do so.

306.    Accordingly, the Plaintiffs are entitled to injunctive relief and other relief, including, but not limited to, damages resulting from the breaches of duty as described herein.

**COUNT V**

**(Failure to Properly Fund the Plan, and Breach of Fiduciary Duty, 29 U.S.C. § 1021)**
**Historical DuPont, DowDuPont, Corteva, and Their Respective Boards and Board Members**

307.   The Plaintiffs and the class repeat and reallege the preceding paragraphs as if fully set forth herein.

308.   As set forth in this Complaint, the Defendants have repeatedly failed to fund the Plan to a level where it may meet its future obligations.

309.   In choosing to only contribute the minimum amount required, using the MAP-21 MRC calculations, the Defendants have created a Plan that is so underfunded that it is at an increased risk of failure.

310.   The Defendants actions have left the Plan with a downward spiral in funded status and an ever-increasing MRC.

311.   Based on the most recent supplemental notice for the Plan, without adjusted rates, which will apply once the MAP-21 smoothed interest rate corridor expands to encompass actual interest rates, the MRC for the Plan will approach, if not exceed $1,000,000,000.

312.   The removal of the Plan's assets and liabilities from the historical company that founded it and shift to an unrelated, new company's controlled group that lacks the support of both historical companies and their new iterations, has left the Plan and its participants in a worse position than they were prior to the shift.

313.   Removing Historical DuPont's business functions, leaving it as a shell company with no possibility of performing its duties under the Plan, leaves the Plans with no possibility of ongoing solvency.

314.   Shifting the Plan to the responsibility of a newly-formed company that was at one time a subsidiary of the Plan Sponsor, all while removing the business functions that formerly supported the Plan, has left the Plan in an unsustainable position.

315.    The decision by the fiduciaries to shift Plan assets and liabilities was made for the purpose of removing the Plan liabilities from the accounting records of the non-Corteva corporate Defendants and was not made in the best interest of the Plan or the plan participants.

316.    Accordingly, the Plaintiff and class members seek injunctive relief requiring the non-Corteva corporate Defendants remain liable to the Plan either as additional plan sponsors or by remaining part of the Plan's controlled group.

### COUNT VI
### (Prohibited Transaction in Violation of 29 U.S.C. § 1106(a))
### All Defendants

317.    The Plaintiffs and the class repeat and reallege the preceding paragraphs as if fully set forth herein.

318.    The shift of the Plan and its liabilities to a new controlled group, thereby removing the Plan liabilities from the other Defendants assets and liabilities, created an immediate benefit for the non-Corteva controlled group Defendants.

319.    The removal of $19 billion in difficult to divest liabilities from the asset and liability calculations from the non-Corteva controlled group corporate Defendants created an instant gain for the non-Corteva controlled group Defendants.

320.    Plan fiduciaries were aware of the direct and/or indirect benefit to the non-Corteva controlled group entities at the time the strategy was formulated.

321.    The Plan's fiduciaries knew or should have known that the shift of the shell of the Plan Sponsor, including plan assets, to Corteva would directly and/or indirectly benefit the non-Corteva controlled group entities and harm Plan participants by leaving the Plan Sponsor devoid of all business function and unable to meet its promised funding obligations as set forth in the Plan and as required by ERISA.

322.    Accordingly, the Plaintiffs are entitled to injunctive relief requiring the return of the Plan assets and liabilities to the reincarnation of the company that created it, New DuPont, full-

funding of the Plan, and other relief, including, but not limited to, disgorgement of profits obtained and damages resulting from the breaches of duty as described herein.

**COUNT VII**
**(Co-Fiduciary Liability, 29 U.S.C. § 1105)**
**All Defendants**

323.    The Plaintiffs and the class repeat and reallege the preceding paragraphs as if fully set forth herein.

324.    All Defendants are co-fiduciaries pursuant to 29 U.S.C. § 1105.

325.    Each of the Defendants knowingly participated in or knowingly undertook to conceal an act or omission of another fiduciary when he or she knew the act or omission is a breach of duty to the Plan.

326.    Each of the Defendants further enabled other fiduciaries to commit a breach and/or each Defendant has knowledge of a breach by another fiduciary and took no reasonable efforts to remedy the breach.

327.    Accordingly, the Plaintiffs are entitled to injunctive relief requiring the return of the Plan assets and liabilities to the reincarnation of the company that created it, New DuPont, full-funding of the Plan, and other relief, including, but not limited to, disgorgement of profits obtained and damages resulting from the breaches of duty as described herein.

**VII.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray this Court enter judgment as follows:

A.    Certifying this action as a class action;

B.    An Order for affirmative injunctive relief requiring the Defendants to fully fund the plan;

C.    An Order requiring the Defendants to remain part of the controlled group of the Plan and/or undoing the transfer of Historical DuPont and the Plan assets and Liabilities to Corteva;

D.    An award, in an amount to be proven at trial, of the losses to the Plan resulting from the breaches alleged herein;

E.    An Order requiring the disgorgement of profits resulting from the allegations contained herein;

F.    An award of statutory penalties for providing inaccurate and deceptive funding notices;

G.    Awarding Plaintiffs

    a.    their costs, disbursements and expenses herein;

    b.    reasonable attorneys' fees; and

H.    Awarding the Class such other and further relief as the Court may deem just, proper, and equitable.

| DATED: July 3, 2019 | | KANTOR & KANTOR<br>BEASLEY ALLEN CROW METHVIN<br>   PORTIS & MILES, P.C.<br>SINCLAIR LAW FIRM, LLC<br>EDWARD STONE LAW, P.C. |
|---|---|---|
| | By: | /s/  *Elizabeth Hopkins*<br>ELIZABETH HOPKINS<br>JAMES EUBANK (*pro hac vice* pending)<br>REBECCA D. GILLILAND (*pro hac vice* pending)<br>W. DANIEL MILES III (*pro hac vice* pending)<br>THOMAS O. SINCLAIR (*pro hac vice* pending)<br>EDWARD S. STONE (*pro hac vice* pending)<br><br>**Attorneys for Plaintiffs** |