ELIZABETH HOPKINS, SBN: 324431
SUSAN L. METER, SBN: 236133
KANTOR & KANTOR
19839 Nordhoff Street
Northridge, California 91324
Telephone: (818) 886-2525
Facsimile: (818) 350-6274
Email: ehopkins@kantorlaw.net
        smeter@kantorlaw.net

EDWARD S. STONE (*pro hac vice*)
EDWARD STONE LAW P.C.
175 West Putnam Avenue, 2nd Floor
Greenwich, Connecticut 06830
Telephone: (203) 930-3401
Facsimile: (203) 348-8477
Email: eddie@edwardstonelaw.com

W. DANIEL MILES, III (*pro hac vice*)
JAMES EUBANK (*pro hac vice*)
BEASLEY ALLEN CROW METHVIN
    PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (800) 898-2034
Facsimile: (334) 965-7555
Email: dee.miles@beasleyallen.com
        james.eubank@beasleyallen.com

THOMAS O. SINCLAIR (*pro hac vice*)
SINCLAIR LAW FIRM, LLC
2000 SouthBridge Parkway, Suite 601
Birmingham, Alabama 35209
Telephone: (877) 249-0091
Facsimile: (205) 868-0894
Email: tsinclair@sinclairlawfirm.com

**ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISHNAN R. THONDUKOLAM, STEPHEN W. RECORDS, WILLIAM C. MALLONEE and DAVID L. EVERETT, individually and as representatives on behalf of a class of similarly situated persons,<br><br>    Plaintiffs,<br><br>    vs.<br><br>CORTEVA, INC.; DOWDUPONT INC.; DUPONT DE NEMOURS, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE PENSION AND RETIREMENT PLAN[1]; THE ADMINISTRATIVE COMMITTEE<br><br>    Defendants. | Case No.: 3:19-cv-03857-YGR<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |

---

[1] Previously named as "U.S. DUPONT PENSION AND RETIREMENT PLAN."

SECOND AMENDED CLASS ACTION COMPLAINT                                         - 1 -

Plaintiffs, Krishnan R. Thondukolam, Stephen W. Records, William C. Mallonee and David L. Everett ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following:

## I.     PRELIMINARY STATEMENT

1.      Plaintiffs are participants in the Pension and Retirement Plan, formerly titled the U.S. DuPont Pension and Retirement Plan (the "Plan"), a "defined benefit pension plan" within the meaning of 29 U.S.C. § 1002(35). Plaintiffs bring this action on their own behalf and on behalf of all similarly situated participants, their beneficiaries and estates, pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA") and seek, for themselves and on behalf of one or more classes of pension plan participants and their beneficiaries, declaratory, permanent injunctive and other appropriate equitable and remedial plan-wide relief as follows.

## II.     JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and under the specific jurisdictional statute for claims brought under ERISA, 29 U.S.C. § 1132(e), (f).

3.      Pursuant to 29 U.S.C. § 1132(e)(2), venue is proper in this District, in that the Defendants may be found in this District and/or because one of the Plaintiffs and other participants in the Plan earned and accrued pension benefits while residents within this district, and pursuant to 28 U.S.C. § 1391(b).

## III.     PARTIES

### A.     Plaintiffs

4.      Plaintiff Krishnan R. Thondukolam is a participant of the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Contra Costa County, California. At the time of his

retirement, he had nearly 40 years of qualified service with pre-merger DuPont within the meaning of the Plan from January 1975 until December 2014.

5.      Plaintiff Stephen W. Records is a participant of the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Pinal County, Arizona. At the time of his retirement, he had nearly 36 years of qualified service with pre-merger DuPont within the meaning of the Plan from August 1979 until September 2015.

6.      Plaintiff William C. Mallonee is a participant of the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Lane County, Oregon. At the time of his retirement, he had over 35 years of qualified service with pre-merger DuPont within the meaning of the Plan from June 1966 until October 2001.

7.      Plaintiff David L. Everett is a participant of the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Ada County, Idaho. At the time of his retirement, he had over 36 years of qualified service with pre-merger DuPont within the meaning of the Plan from June 1979 until December 2015.

**B.      Defendants**

8.      Defendant Corteva, Inc., ("Corteva") is a Delaware corporation with its corporate headquarters located at 974 Centre Road, Building 735, Wilmington, DE 19805. As of June 1, 2019, Corteva, a former subsidiary of DuPont, is now the parent company of E.I. du Pont de Nemours and Company ("EID") and is the entity with ultimate responsibility for the maintenance of the Plan. According to a statement directed to Plan Participants to inform them of the status of the Plan made by then DowDuPont and former EID CEO Ed Breen, Corteva would fully assume the responsibility for the Plan, would "maintain the Plan," "will . . . make contributions to the Plan," and be the "future steward of the Plan." As such, Corteva is a Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

9.      Defendant DowDuPont, Inc. ("DowDuPont"), was an agricultural, materials science, and specialty products manufacturer that formed as the result of a merger between Defendant EID and Dow. It was incorporated in the State of Delaware with its corporate headquarters located at 974 Centre Road, Building **730**, Wilmington, DE 19805. It had control over the Plan assets and discretionary authority and control over the Plan management and administration during some of the relevant period. As such, DowDuPont is a Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

10.      Defendant DuPont de Nemours, Inc., ("DuPont") is a Delaware corporation with its corporate headquarters located at 974 Centre Road, Building **730**, Wilmington, DE 19805. DuPont came into existence on June 1, 2019, when Defendant DowDuPont, Inc. changed its legal name to DuPont de Nemours, Inc.

11.      Defendant E. I. du Pont de Nemours and Company ("EID") had been the Plan sponsor for over one hundred years. Before the merger, EID was a Delaware corporation with its corporate headquarters located at 974 Centre Road, Chestnut Run Plaza, Building **730**, Wilmington, DE 19805. After the spin-off of Corteva, EID has its corporate headquarters located at 974 Centre Road, Chestnut Run Plaza Building **735**, Wilmington, DE 19805. EID is now a wholly-owned subsidiary of the newly created Corteva, with no separate assets or business operations. In both its pre- and post-merger incarnations, EID is a Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

12.      Defendant Administrative Committee is the "Plan Administrator" and "named fiduciary" of the Plan, pursuant to Title I, Section II of the Plan documents. Under the Plan, the Administrator has authority to adopt rules, regulations, and policies for the Plan's administration, to make eligibility and other benefits determinations under the Plan, and to interpret and/or effectuate the Plan. Thus, the Administrative Committee, and its members, are the "Administrator" of the Plan, within the meaning of 29 U.S.C. § 1002(16)(A)(i); "plan fiduciaries" within the

meaning of 29 U.S.C. § 1002(21)(A); and the "named fiduciaries" of the Plan with the authority and control to manage the operation and administration of the Plan within the meaning of 29 U.S.C. § 1102(a).

## IV.    CLASS ACTION ALLEGATIONS

13.    **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All participants in and beneficiaries of the Pension and Retirement Plan or, if deceased, their Estates, who are vested and eligible to either currently receive benefits under the Plan or who are vested and qualified to receive benefits at a future date.

14.    **Numerosity**. According to the Plan's 2017 Form 5500 filing, at the beginning of Plan Year 2017, the total number of participants was 121,174. This is the last reported number of participants prior to the DowDuPont merger. The Plan's 2018 Form 5500, which contains the most recent available data, indicates there were 106,804 participants at the end of Plan Year 2018. The number of participants, each of which would be a potential plaintiff, is so numerous that it would be impractical for each to bring an individual claim.

15.    **Commonality**. There are questions of law or fact common to all members of the Class that concern Defendants' actions and entail consideration of Plan and ERISA provisions uniformly applicable to all Class members. Resolution of these questions will not require individual inquiry into the actions or circumstances of individual Plan participants. These common questions of law or fact center upon whether the Defendants violated ERISA and the Plan terms in such a manner as to divest the Plan from DuPont, which still maintains the vast majority of EID's historical business segments and employees.

16.    **Typicality**. Plaintiffs are members of the Class as defined above. They have all been similarly harmed by the Defendants' actions in violating ERISA and the Plan documents, and

in failing to properly protect the Plan and its participants and beneficiaries. They assert the same claims and legal theories under the same provisions of ERISA, and Regulations promulgated thereunder, that all Class members might assert.

17.     **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the absent members of the Class. Because their claims are typical of those of absent members of the Class, Plaintiffs have every incentive to vigorously pursue those claims on behalf of absent Class members. Their interests coincide with, and are not antagonistic to, those of the Class. Moreover, Plaintiffs are represented by counsel experienced in ERISA and complex class action litigation.

18.     **Rule 23(b)(1) Requirements**. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants, and a risk of adjudications which as a practical matter would be dispositive of the interests of other members of the Class who are not parties.

19.     **Rule 23(b)(2) Requirements**. Defendants have acted and/or refused to act and are likely to act and/or refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and other relief with respect to the Class as a whole.

## V.     SUMMARY

20.     DuPont faced massive pension liabilities and the company's executives found a way to greater profitability by retaining all the corporation's assets while transferring a shell of the company (EID), in name only, along with the pension Plan's entire liabilities into a subsidiary of a newly created company (Corteva) that was merely a division of the prior DowDuPont conglomerate. At its heart, this case is about whether ERISA's protections for workers and their pensions can be avoided through such a ruse, which, if permitted, would essentially allow a plan sponsor to terminate the entirety of its pension funding obligations by shifting them onto a newly formed company as long as the original corporate entity went with it, regardless of whether it retains its original businesses. If all that matters in enforcement of Plan funding requirements is

that the corporate entity or federal tax id number remain unchanged, then ERISA's plan termination and transfer protections would become completely illusory, and liability to every participant in a U.S. pension plan may be disposed of by such means.

21.     The transfer of Plan liabilities and assets in this matter was accomplished through an intricate web of mergers, acquisitions and spin-offs, designed, in part, to obscure the true nature of the pension termination or transfer, and which this suit only challenges with respect to the failure to abide ERISA's (and the Plan terms') protections. To untangle that web, consider that all of the described transactions in this complaint occurred in a single day. At 8:00 AM the employees of DuPont had their pensions backed by the ongoing operations of a massive company. At 8:00 AM, DuPont was obliged to meet its 114-year-old pension obligations. By 5:00 PM of that same day, DuPont had moved its core business operations, assets and employees into a new corporate entity, and transferred a shell of its former self (EID), along with the Plan, to a new company (Corteva), for which almost none of the plan participants had ever worked. In turn, nearly all of EID's former corporate officers miraculously remained with DuPont, which, having divested itself and its books of billions of dollars of underfunded pension liabilities, faced a more prosperous future.

22.     By implementing the separation in this way, DuPont avoided ERISA's plan termination requirements, which are designed to ensure that profitable companies like DuPont continue to ensure and ultimately pay the pension they promised their employees over the last 100 years. Plan sponsors are only permitted to terminate pension liabilities under a strict set of guidelines that provide immediate guaranties that the plan has sufficient funds to pay all benefits owed to participants. As DuPont admits in its Annual Pension Funding notices, "[t]here are two ways an employer can terminate its pension plan. First, the employer can end the plan in a 'standard termination' but only after showing the PBGC that the plan has enough money to pay all benefits owed to participants. Under a standard termination, a plan has must either purchase an

annuity from an insurance company . . . or, if the plan allows, issue one lump sum payment that covers your entire benefits." The second way involves a distress termination in bankruptcy. Neither the Plan documents nor ERISA's regulations allow any other method for a plan sponsor to avoid its funding requirements to the plan, that is unless DuPont's web of corporate transactions is permitted to create a third way. If this third way of avoiding plan funding requirements is permitted to stand, ERISA's primary purpose to protect the retirement security of American workers would be gutted. These actions taken as a whole resulted in a de facto termination, and the fiduciaries were obligated to treat it as such.

23.     EID is no longer the DuPont known since 1802. "New" DuPont is DuPont: taking the assets, control, goodwill of the names and logos and key personnel from EID, and leaving EID in name only as a subsidiary of its own former subsidiary, Corteva, with the pension liability as the only vestige of the company it once was. The Plan terms promised, for more than 100 years, that DuPont would provide its employees, many of whom worked their whole lives for the company, with retirement benefits. The Plan terms make clear DuPont was the Plan Sponsor responsible for the funding of the Plan and meeting the Plan obligations.

24.     By taking the actions described herein, EID, the two-hundred-year old corporation known the world over, made itself into a shell corporation to be used as merely a vehicle to bypass federal pension regulation, while DuPont declares itself free from its pension obligations. Thus, in a series of transactions, DuPont claims no further pension debts, and is now claiming to have created a new, third way to terminate pension obligations. To be clear; DuPont de Nemours, Inc. is the true continuation of what was EID and must honor its commitments to its employee participants of the Plan.

## VI.     STATUTORY BACKGROUND

25.     In keeping with the trust law underpinnings of the statute, ERISA requires that every employee benefit plan be established and maintained pursuant to a written plan document

that expressly designates one or more named fiduciaries charged with managing and administering the plan. 29 U.S.C. § 1102(a)(1), (2). ERISA requires that assets of the plan be held in trust by a trustee, but the statute broadly defines the term fiduciary, not just "in terms of formal trusteeship, but in functional terms of control and authority over the plan, see 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons subject to fiduciary duties – and liable for damages – under [29 U.S.C. § 1109]." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).

26.     Thus, in addition to persons designated in plan documents as fiduciaries, by statute, a fiduciary is any person that "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." Persons that render investment advice for a fee or other compensation are also fiduciaries of a plan. Additionally, any person that has "any discretionary authority or discretionary responsibility in the administration of such plan" is also a fiduciary. 29 U.S.C. § 1002.

27.     Fiduciaries of a plan under ERISA are charged with discharging their duties "with respect to a plan solely in the interest of the participants and beneficiaries" and "(A) for the exclusive purpose of: i. Providing benefits to participants and their beneficiaries; and ii. Defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter IV." 29 U.S.C. § 1104.

28.     ERISA is also designed to serve its remedial purposes of protecting plan participants and beneficiaries "by requiring the disclosure and reporting to participants and

beneficiaries of financial and other information with respect" to their plans. 29 U.S.C. § 1001(b). See also 29 U.S.C. § 1001(a) (addressing "the lack of employee information and adequate safeguards concerning [plan] operation" by requiring "that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans").

29.     Title I of ERISA, accordingly, begins in Part 1 with certain reporting and disclosure requirements for plans. Specifically, sections 1021-1025 lay out requirements including the provision of a summary plan description ("SPD"), annual reports, and participant's benefit statements, among other things. The duty to disclose information is both encompassed within ERISA's statutory duties of prudence and loyalty as well as being specifically enumerated by the statute's disclosure requirements.

30.     ERISA contains provisions that severely limit when and how a plan sponsor may terminate a pension plan, allowing terminations only through a "standard termination" or a "distress termination." 29 U.S.C. § 4041.

31.     If a plan is under-funded and seeks a distress termination, it must demonstrate to the Pension Benefit Guaranty Corporation (PBGC), the government agency that collects premiums to insure the payment of benefits, that the sponsoring employer is "in financial distress and prove to a bankruptcy court or the PBGC that the employer cannot remain in business unless the plan is terminated." 29 C.F.R. § 2520.101-5, Appendix A.

32.     Under 29 C.F.R. § 4041.41, distress terminations should only be granted in one of four situations: a. Liquidations in bankruptcy, of the plan sponsor and every member of the plan sponsor's controlled group; b. Reorganization in bankruptcy, of the plan sponsor and every member of the controlled group; c. when the PBGC determines that termination is necessary to allow the employer to pay its debts when due; or d. when the PBGC determines that termination is necessary to avoid unreasonably burdensome pension costs caused solely by a decline in the employer's work force.

33.     If the distress termination application is granted, the PBGC will take over and become the trustee, paying plan benefits in a reduced amount using both remaining plan assets and PBGC guarantee funds.

34.     DuPont did not apply and would not have qualified for a voluntary distress termination

35.     Though it does not occur often, the PBGC can itself initiate a form of distress termination called an involuntary termination. 29 U.S.C. § 4042. The result is the same as if the company initiated the distress termination – the PBGC takes over as trustee and the plan beneficiaries receive reduced benefits in accordance with the PBGC guidelines. The Plan did not qualify for an involuntary termination at the time of the spin-off of Corteva.

36.     For a standard termination, a plan must be fully funded – it must demonstrate to the PBGC that the plan has sufficient assets to pay all of the current and future benefits owed to the plan participants. 29 U.S.C. § 4041(b).

37.     One means of quickly terminating a plan with a standard termination, is to finance the full funding of the plan with other debt, such as a loan, if the alternative debt has a lower interest rate than the future administrative costs associated with maintaining the pension.

38.     Indeed, ERISA's provision on standard terminations contemplates that a change in controlled group can be considered a termination. Section 4041 contains a special interest rate rule applicable where "(i) there is a transaction or series of transactions which results in a person ceasing to be a member of a controlled group, and (ii) such person immediately before the transaction or series of transactions maintained a single-employer plan which is fully funded." 29 U.S.C. § 4041(b)(5).

39.     This language shows that a transaction that results in a plan sponsor being excised from its controlled group, with its defined benefit plan, is a termination event. Such an event requires full funding, thus triggering this provision's special interest rate requirement.

40.     "Controlled group" for a single employer plan means the plan sponsor and all other entities "under common control" with the plan sponsor. 29 U.S.C. § 4001(a)(14).

41.     Under this definition, there was a change in the controlled group of EID, the Plan sponsor. Before the merger and spin, the controlled group consisted of EID and all of its many subsidiaries, including Corteva. After the merger and spin of Corteva, EID's controlled group consisted of itself and its former subsidiary, Corteva, which is now its parent.

42.     Clearly ERISA's standard termination provisions contemplate that such a series of transactions constitute a plan termination, requiring full funding using a prescribed, protective interest rate.

43.     No provision of ERISA permits a company to transfer a defined benefit plan that is not fully funded to another company to fulfill the remaining obligations of the plan. Instead, ERISA only permits such a transfer to occur when the sponsoring company has instituted and met the requirements for a standard termination, including by fully funding the plan with sufficient assets to cover 100% of the present value of its liabilities. 29 U.S.C. § 4041(b).

44.     As described below, defendants did none of these things when they engaged in a series of transactions that resulted in a change of the "controlled group" of EID, the original Plan sponsor. Additionally, they implemented the spin-off of Corteva, with EID as a subsidiary, along with the Plan, so as to obscure the nature of this unprecedented change in sponsorship, with only corporate profit in mind.

## VII.    FACTS

45.     The "Company" that sponsors and is obligated to fund the Plan is defined in the Plan documents to mean "E. I. du Pont de Nemours and Company and/or any wholly owned subsidiary or part thereof which adopts this Plan with the approval of the Administrative Committee, or such person or persons as the Administrative Committee may designate."

46.     On December 11, 2015, Historical DuPont announced a merger with Historical Dow in an all-stock transaction. As part of the merger, Historical Dow shareholders received a fixed exchange ratio of 1.00 per share of DowDuPont for each Historical Dow share, and Historical DuPont shareholders received a fixed exchange ratio of 1.282 shares of DowDuPont for each Historical DuPont share.

47.     As part of the preparation for merger, the two companies and their boards planned how to deal with their combined $51 billion in pension obligations. That strategy included, from its inception, an intention to merge the companies, then later divide into three separate entities.

48.     Although, at the time of the merger announcement, the companies may have already decided which of the three yet-to-be-formed companies would maintain the Plan liability, it took nearly three years from announcement of the merger for the companies to tell the employees that Corteva, and not "new" DuPont, would be assigned 100% of the Plan liabilities.

49.     In May 2016, DuPont released a Fact Sheet containing updates on the Plan and Answers to Questions DuPont alleges to have received regarding the Plan. DuPont indicated that the trust assets and liabilities would be transferred from DuPont and allocated to the new companies. In responding to a question regarding what would happen to the Plan after the merger and separation of the merged company into three separate corporations, DuPont stated:

> In terms of the allocation of pension liabilities and related assets following the intended separations of the combined company into three companies, we will work thoughtfully and diligently to review and consider all of the factors and elements that will need to take place *as we transition the pension to the <u>new companies</u>*. Importantly, *we will* continue to fund the pension plan in accordance with all the legal requirements, as we always have, and the amounts of existing pensioners' benefits will not change, *even if over time the name of the company that administers the benefit changes*. Additionally, the accrued benefit for active employees will not be reduced.
>
> The intended separations will be consummated as soon as practicable following the consummation of the merger, but the consummation of such separations is not expected to exceed 18-24 months following the closing of the merger. The closing of the merger is expected to take place in the second half of 2016. *At this time, no*

*final decisions have been made as to the allocation of pension liabilities and related assets following the intended separations*.

By stressing that "we will continue to fund the pension plan as we always have," the obvious implication is that the vast assets of the Dupont corporation would still back most or all of the pension liabilities.

50.     This document, filed by pre-merger DuPont and pre-merger Dow, demonstrates both the Boards of the two, still-separate, pre-merger companies were working together to determine the ultimate position of the assets and liabilities of the Plan and decision-making authority over the Plan assets. It confirms the original intention to move the Plan assets and liabilities away from the business operations of the pre-merger DuPont as part of the intended separation of the pre-merger companies into the three new companies, one of which, Corteva, was designed either to fail or to struggle with Pension and other large uncapped liabilities that its business operations were unlikely to be able to sustain.

51.     This is precisely the type of scenario, where a plan sponsor ceases to be a member of a controlled group, in which ERISA seeks to protect employees (and the PBGC) from the corporate machinations that might otherwise ignore the promises made to them by their employers.

52.     Despite this likely intent from the beginning, prior to the spin-off, the merged companies made statements indicating that it was "contemplated" that appropriate portions of the Plan would be allocated to each of the three successor businesses, see DowDuPont 2016 S-4, presumably in rough proportion to the numbers of employees and retirees associated with each of the lines of businesses. That is not what happened.

53.     On February 26, 2018, DowDuPont issued a press release announcing that after the spin-off of the Agriculture Division planned for June 2019, the new company would be named Corteva Agriscience. The release further stated Corteva would combine "DuPont Crop Protection,

DuPont Pioneer and Dow AgroSciences" to comprise the company. All three businesses listed focused solely on the agricultural business sector.

54.    On September 17, 2018, DowDuPont issued a press release announcing the senior leadership for the future independent companies: Corteva Agriscience, DuPont, and Dow.

55.    The release named James. C. Collins, Jr., Greg Friedman, and Cornel Fuerer as leaders for Corteva. Each had worked in DuPont and then DowDuPont's agricultural business prior to the spin-off for nearly a decade or more. All three remain at Corteva as senior executives as of the date of this filing.

56.    The release named Marc Doyle, Jeanmarie Desmond, and Erik Hoover as leaders for DuPont. Each had been employed with EID for 12 years or more.

57.    Just nine months after the spin-off of Corteva, in February 2020, Marc Doyle was fired as CEO of DuPont. Ed Breen, who had served as CEO of DuPont beginning in 2015 and then DowDuPont beginning in 2017 through the spin-off of Corteva, was re-hired as CEO. Breen also served as chairman of the board of directors for DuPont beginning in 2015, then for DowDuPont through the spin-off of Corteva, and for DuPont since the spin.

58.    In the November 1, 2018 letter from then DowDuPont CEO Ed Breen, directed to Plan Participants, Breen informed Participants "I am pleased to tell you that following the intended separation of the Specialty Products and Agriculture Divisions of DowDuPont on June 1, 2019, the heritage U.S. DuPont pension and retiree benefit obligations (retiree medical, dental and life insurance plans) will be assumed fully by Corteva Agriscience."

59.    In his letter, Breen further informed participants that "Corteva Agriscience, . . . will maintain the Plan . . .. Moreover, consolidating plan administration through one strong entity will allow for more efficient recordkeeping systems and supporting processes . . .."

60.     After proclaiming Corteva's commitment to the Plan, Breen further explained that the commitments made to the Plan would not change "with Corteva Agriscience as the future steward of the Plan."

61.     On October 3, 2018, DowDuPont issued a press release entitled "DuPont Sets the Stage for a Future That is Wide Open." The release began, "For over 200 years, DuPont has been synonymous with life-changing discoveries and scientific know-how, reinventing ourselves along the way. As we take the next step toward becoming the new DuPont, we are unveiling a fresh global brand identity and logo that recognizes our heritage while conveying our focus on a customer-led innovation strategy and purpose-driven culture."

62.     Although the release stated that an updated brand logo was to be used by DuPont after the spin-off of Corteva, in fact, the "new" logo was still the word "DUPONT" in the shape of an oval, with some slight alteration to font and outline.

63.     Furthermore, although the release concluded by stating that "The DuPont Oval logo, DuPont™ and all products, unless otherwise noted, denoted with ™, ℠ or ® are trademarks or registered trademarks of E.I. du Pont de Nemours and Company or its affiliates," neither the oval logo nor DuPont name would stay with EID when it became a subsidiary of Corteva after the spin-off.

64.     Indeed, in filings with the SEC, EID notes that it no longer does business as DuPont, but instead states it is "d/b/a Corteva Agriscience."

65.     On November 2, 2018, DowDuPont issued a press release announcing the persons who would serve on the boards of directors for the three future companies after the spin-offs. Notably, the board for DuPont was to include key members of the former EID, including Ed Breen as chair and Eleuthère I. du Pont, who is the namesake and 4th-great-grandson of the founder of DuPont: Éleuthère Irénée du Pont de Nemours.

66.     According to SEC filings, EID maintained the same telephone number for years: (302) 774-1000. After the spin-off, this number was assigned to DuPont, while Corteva and EID's contact numbers are now listed in filings as (302) 485-3000.

67.     In 2014, EID moved its headquarters to suburban Wilmington, DE from its downtown location, where it had been for 107 years. The new location was at Chestnut Run Plaza.

68.     In its Form 5500 filings with the DOL, from 2015 through 2017, EID listed its mailing address as 974 Centre Road, Chestnut Run Plaza 730-3355-6, Wilmington DE 19805. The "730" in that address refers to the building number at the business complex.

69.     In October 2019, post-spin, EID filed a Form 5500 for the 2018 plan year, and a revised form for 2017. Both of those filings show the address as 974 Centre Road, Chestnut Run Plaza 735-4330-4, Wilmington DE 19805. The new address indicates offices were moved to another building, while DuPont kept EID's address.

70.     This is confirmed by the SEC's Edgar CIK data, which presently lists the addresses of Corteva and EID as "Building 735," while DuPont occupies "Building 730," which was the traditional address of EID pre-merger.

71.     On April 1, 2019, the first planned spin from DowDuPont was completed, forming a new company, Dow, Inc. The New Dow, even though it was technically a new corporate entity number and EIN, maintained its pension plan, because it was still Dow. Conversely, even though DuPont was still the same company it had been for 200 years, excised from its books all pension liabilities and placed the pension plan into the newly-formed and much smaller agricultural company, Corteva, claiming the Plan was not terminated or transferred because it stayed with EID, a shell subsidiary of Corteva, that carried the same corporate and tax id numbers and that were formerly used by pre-merger Dupont.

72.     Prior to the merger of the two companies, EID reported total worldwide employment of about 44,000 and Dow reported total worldwide employment of 54,000 people in

their 2017 10-K filings with the SEC. Post-merger, those numbers stayed the same in DuPont and Dow's filings and DowDuPont reported 98,000 employees in its 2018 10-K. Post-separation total employment reported was 35,000 for DuPont, 36,500 for Dow, and 21,000 for Corteva per their 2019 10-Ks. From these numbers, we see Corteva has less than one quarter of the total employees of the combined DowDuPont, and less than half of pre-merger DuPont.

73.     The Plan's Form 5500 filed with the Department of Labor for the 2018 plan year revealed that 96,881 of the Plan's 106,804 participants were either retired, separated, or deceased at the end of 2018. This left only 9,923 Plan participants who were still actively employed as of December 31, 2018. That is roughly 9.3% of the Plan's participants.

74.     By those numbers, Corteva kept approximately 21.4% of DowDuPont's total employees. Because many had worked for Historical Dow, only a fraction of those were employees of DuPont prior to the merger and separations, and only a small fraction of those could even possibly be participants in the DuPont Plan, which was frozen to new participants in 2007. However, Corteva has assumed 100% of the pension liability for all 106,804 current and former DuPont retirees and their beneficiaries.

75.     Put into perspective another way, if you assume Corteva's 21,000 employees came equally from Historical Dow and EID, and that the 9.3% rate of active participants is consistent across employees who went to DuPont and Corteva post-spin, only 977 participants would have worked for Corteva.

76.     Prior to the merger with Historical Dow, DuPont was publicly traded and listed on the New York Stock Exchange using the ticker symbol DD. Upon the merger forming DowDuPont, DD stock ceased to be traded, and instead DowDuPont was listed using the ticker symbol DWDP. After the spin-off of Corteva, with EID as a subsidiary, Corteva was listed using the ticker symbol CTVA. Meanwhile, DuPont abandoned the DWDP symbol to once again trade using DD as of June 3, 2019.

77.     On June 1, 2019, contemporaneously with the spin-off of Corteva, DowDuPont changed its registered name to DuPont de Nemours, Inc. It also announced that it would do business as "DuPont." Also on June 1, 2019, DowDuPont completed the separation of its agriculture business, Corteva, Inc. DowDuPont continues to hold the specialty products business, and changed its registered name from "DowDuPont, Inc." to "DuPont de Nemours, Inc." DowDuPont announced that Plan participants employed by DuPont de Nemours, Inc. became retirees or terminated vested participants of the Plan as of June 1, 2019. and it announced that E.I. DuPont de Nemours and Company, now a subsidiary of Corteva, Inc., "continued" as plan sponsor of the Plan.

78.     Having taken its historical core businesses, name, logo, trademarks, ticker symbol, executive leadership and employees, DuPont de Nemours has become the true successor entity to EID. The only things left with EID after the spin-off of Corteva are a small fraction of the employees, a segment of businesses only recently acquired, and the massive pension liability for Plan participants, the vast majority of whom have never worked for Corteva.

79.     The spin-off of agricultural holdings to form Corteva, alone, is not a violation of ERISA. However, the implementation of the spin-off, through which EID was stripped of its historical core business segments and sent to a new controlled group with the entirety of EID's pension obligation, regardless of the segments in which Plan participants earned their benefits, is a de facto termination of the Plan, and a violation of ERISA.

### VIII.   CLAIM FOR RELIEF

**COUNT I**
**(Breach of Fiduciary Duty, 29 U.S.C. § 1104)**
**All Defendants**

80.     Plaintiffs and the class repeat and re-allege the foregoing paragraphs as if fully set forth herein.

81.     Defendants exercised control over plan assets and/or discretionary control and authority over plan management and administration and were, therefore, fiduciaries and owed fiduciary duties to the Plan and to the Plan participants.

82.     After deciding to spin E. I. du Pont de Nemours and Company, Corteva, Inc. and Dow out of DowDuPont, Inc. to form separate companies, the Defendants implemented such separation in a manner that stripped the Plan from the businesses that comprised the core of EID's controlled group and employed the vast majority of Plan participants.

83.     Defendants did so in order to remove responsibility for the Plan liabilities from the accounting and reporting of DuPont de Nemours, Inc., which is really the reincarnation of Historical DuPont, merely with a new corporate entity number at the Delaware Secretary of State's Office.

84.     This was done without going through ERISA's termination procedures, which would have required, among other things, 100% funding of all Plan liabilities.

85.     In other words, the only reason that the corporate entity E.I. du Pont de Nemours and Company remained in existence during and after the spin-off of Corteva was so that DuPont de Nemours, Inc. could implement the spin-off of Corteva and EID so as to evade its pension liability by pointing to EID's continued existence to argue that it did not terminate its pension by dumping its pension obligations into a new company.

86.     This is reinforced by the fact that Dow, Inc., while no longer the same corporate entity as the Dow Chemical Company, kept its pension plan. In so doing, Dow met its fiduciary obligations by recognizing that it could not simply evade responsibility to its plan participants by assigning itself a new entity number.

87.     That EID is only a Delaware corporate entity number, and no longer the "DuPont" that promised its employees a pension, is evidenced by the fact that DuPont de Nemours, Inc., the so-called "new" DuPont, kept all of its core historical specialty products business where most Plan

participants were or are employed; kept the "DuPont" logo, trademarks, and public name, along with its good will value; assumed EID's stock ticker symbol on the New York Stock Exchange; and kept the same executive leadership, chairman of the board and board member namesake of the company's founder, the corporate office location, and even the same telephone number as the pre-merger DuPont.

88.     By orchestrating and consummating the merger and spinoff, and by saddling newly created Corteva with all of the responsibilities for the future of the Plan, DuPont is now free from the substantial burden of contributing the billions needed to meet the future needs of the Plan.

89.     The effect of the way this spin-off was implemented was to transfer 100% of the Plan's assets (along with its liabilities) to a new company: a transfer that ERISA does not permit.

90.     Plaintiff and the class do not allege violations of ERISA based on the corporate decision to restructure and form new companies, but only based on the implementation of the transaction by executing the separation of the Plan and its participants from the true DuPont.

91.     Since this transfer to a new "controlled group" is a permitted method of terminating a plan under 29 U.S.C. § 1141(b)(5), it should have been considered a de facto termination of the Plan, and establishment of a new Corteva plan, subject not only to the Plan termination rules of Title IV of ERISA, but also to ERISA's stringent fiduciary standards in the way in which it was accomplished.

92.     Defendants did not treat the decision to change the Plan's controlled group as a plan termination. Instead, by insisting that nothing had changed with respect to the Plan sponsor, and that no transfer or termination of the Plan had occurred, Defendants sought to avoid regulatory notice, oversight, approval and full funding requirements, and to benefit themselves at the expense of the interests of participants, which is a breach of their fiduciary duty to the Plan, Plaintiffs, and the class.

93.     The implementation of the Corteva spin-off to dispose of the Plan is distinguishable from other separations or spins that have not implicated ERISA fiduciary duties in that this spin-off not only changed the controlled group responsible for the Plan, it completely separated 100% of participants from company where the vast majority of them were employed while they accrued their benefits and placed them in the shell subsidiary of a newly-formed company.

94.     Defendants' actions, comprised of a series of transactions designed to terminate the liabilities of DuPont to the Plan, constructively terminated the Plan triggering their obligation to fully fund the plan prior to termination, pursuant to 29 U.S.C. § 4041.

95.     Defendants have failed to meet those funding requirements under ERISA arising from their termination.

96.     The decisions made in furtherance of this scheme were in the self-interest of the Defendants and not in the best interest of the Plan or its participants, as is required by ERISA.

97.     In implementing the separation so as to dispose of the Plan and circumvent federal statutes and regulations meant to protect participants and retirees, solely for the benefit of the Defendants, Defendants have breached their duties of prudence and loyalty to the Plan and to participants, in violation of 29 U.S.C. § 1104.

98.     If DuPont is permitted to "withdraw" from its future obligations to the Plan, prudent and loyal fiduciaries on the Administrative Committee, and indeed at Corteva, should be required to demand that DuPont fully fund the pensions of the more than 90% of participants in the Plan who are not, nor will ever be, employees of the Corteva entity.

99.     Accordingly, Plaintiffs are entitled to injunctive relief requiring the return of the Plan assets and liabilities to the reincarnation of the company that created it, New DuPont, full-funding of the Plan, and other relief, including, but not limited to, damages resulting from the breaches of duty as described herein.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray this Court enter judgment as follows:

A.    Certify this action as a class action;

B.    Declare the change in EID's controlled group and declaration by DuPont that it would no longer fulfill its funding obligation resulted in a de facto termination of the Plan;

C.    Order Defendants to fully fund the Plan in the manner that would have been required in a standard termination;

D.    Alternatively, order Defendant DuPont de Nemours, Inc. to remain part of the controlled group of the Plan and/or undo the transfer of the Plan assets and liabilities to Corteva;

E.    Award Plaintiffs

a.    their costs, disbursements and expenses herein;

b.    reasonable attorneys' fees; and

F.    Award the Class such other and further relief as the Court may deem just, proper, and equitable.

| DATED: May 25, 2020 | | KANTOR & KANTOR<br>BEASLEY ALLEN CROW METHVIN<br>   PORTIS & MILES, P.C.<br>SINCLAIR LAW FIRM, LLC<br>EDWARD STONE LAW, P.C. |
|---|---|---|
| | By: | /s/  *Thomas O. Sinclair*<br>ELIZABETH HOPKINS<br>SUSAN L. METER<br>JAMES EUBANK (*pro hac vice*)<br>W. DANIEL MILES III (*pro hac vice*)<br>THOMAS O. SINCLAIR (*pro hac vice*)<br>EDWARD S. STONE (*pro hac vice*)<br><br>**Attorneys for Plaintiffs** |